Exhibit H

A meeting of the Board of Directors of the Buffalo and Fort Erie Public Bridge Authority was convened in public session at the offices of the Authority at 1 Peace Bridge Plaza, Buffalo, New York, on May 25, 2012, at 8:05 a.m. local time.

The meeting was called to order by the Chairman and, upon roll being called, the following members of the Authority were:

PRESENT:

Sam Hoyt, Chairman
Anthony M. Annunziata, Vice Chairman
Valerie A. Beattie
James J. Eagan
Henry J. Froese
Gerald J. Lewandowski
Michael J. Russo
Philip J. Tantillo
Anna T. Tartaglia
Rocco Vacca

ABSENT:

None

The following resolution was offered by Philip J. Tantillo, seconded by Gerald J. Lewandowski:

**Resolution No. 213/12**

**RESOLUTION THAT DEMOLITION OF BUSTI AVENUE
PROPERTIES MAY BE SEGMENTED FROM POTENTIAL
PLAZA PROJECTS AND THAT THE
DEMOLITION OF BUSTI AVENUE PROPERTIES
WILL NOT HAVE A SIGNIFICANT
ADVERSE IMPACT ON THE ENVIRONMENT**

This resolution by the Buffalo and Fort Erie Public Bridge Authority ( "Authority") is adopted on a voluntary basis pursuant to, and in compliance with, Article 8 of the New York State Environmental Conservation Law and the regulations promulgated under Article 8 and set forth at Part 617 of Title VI of the New York Code of Rules and Regulations ("SEQR").

**Project Name:** Demolition and site restoration of properties located on Busti Avenue, between Rhode Island Street and Vermont Street ( "Demolitions" or "Project").

| | |
|---|---|
| **SEQR Status:** | Unlisted Action |
| **Determination of Significance:** | Negative Declaration |
| **Lead Agency:** | Buffalo and Fort Erie Public Bridge Authority |

**Location:** The action involves real property located at 757, 765, 771, 775, 777, 783, 791 & 793 Busti Avenue, City of Buffalo, Erie County, New York (collectively, the "Properties").

**Action Description:** The action involves demolition of up to 8 largely vacant residential structures (and any accessory structures) located on the Busti Avenue block between Rhode Island and Vermont Streets in the City of Buffalo. The demolition will including full removal of all basements, site restoration and grading. Following site grading, the area will be developed according to a landscaping plan in order to provide green space and additional buffering between the Peace Bridge U.S. Customs Plaza ("Plaza") and surrounding neighborhood. Three of the structures to be demolished have previously been determined to be eligible for listing as historic structures on the National Register (the "NRE Properties"), one of which (771 Busti Avenue) has also been designated as a local landmark. As originally contemplated, the proposed action involved the demolition of seven structures which the Authority acquired between 1995 and 1998 on Busti Avenue on the north half of the block between Rhode Island and Vermont Streets. The Authority previously acquired and demolished the south half of the same block almost twelve years ago. There is one parcel on this block which the Authority does not own and which would not be demolished. However, over the last few weeks, the Authority has been in discussions with the owner of this property and has made the owner a formal

purchase offer which the owner has accepted. Thus, the structure on this parcel – located at 775 Busti Avenue – will be demolished as well, making the entire block open green space. Thus, the proposed action has been modified to include acquisition and demolition of 775 Busti Avenue.

## RECITALS:

WHEREAS, the Authority is an International Compact Entity ("Compact Entity") created pursuant to a compact entered into by the State of New York, with the consent of the United States Congress, and Canada; and

WHEREAS, the Authority is authorized under its enabling legislation, (Laws of New York, Chapter 824, § 8 (1933)), to "[t]o acquire, hold and dispose of real and personal property for its corporate purposes"; "[t]o maintain, reconstruct, repair and replace and operate any properties acquired by it, and pay for the same out of any funds collected by it in the operation of properties acquired by it"; and "[t]o do any other act or thing necessary or proper to carry out, accomplish or effectuate the purposes of [its enabling legislation]"; and

WHEREAS, the Authority has long pursued projects aimed at improvements in handling traffic and commerce on the Peace Bridge over a period of several decades; and

WHEREAS, the Authority purchased the Properties between 1995 and 1998 (with the exception of 775 Busti) with the intent of removing the structures to establish additional buffering between the Plaza and the adjacent neighborhood and for possible future expansion; and

WHEREAS, the Authority had previously proposed a project that included construction of a new and much expanded Plaza, an additional bridge crossing the Niagara River, as well as reconstruction, relocation and improvements to connecting roadways on the U.S. side of the border (the "Capacity Expansion Project"); and

WHEREAS, the Capacity Expansion Project was the subject of a combined environmental review pursuant to a Bi-National Integrated Environmental Review Process ("BNIEP"), in accordance with the requirements of various environmental laws, including the National Environmental Policy Act ("NEPA"), resulting in the preparation of a Draft and Final Environmental Impact Statement; and

WHEREAS, the Capacity Expansion Project was also the subject of a consultation process pursuant to Section 106 of the National Historic Preservation Act of 1966 ("Section 106"); and

WHEREAS, pursuant to NEPA and Section 106, the Authority could take no action to demolish the Properties while the BNIEP was underway; and

WHEREAS, in January, 2012, the U.S. Federal Highway Administration ("FHWA")

terminated the Capacity Expansion Project after it determined that the project was not attainable due to a lack of funding availability, as well as based on FHWA's concerns about the environmental impacts of a greatly expanded Plaza; and

WHEREAS, as a result of FHWA's termination of the Capacity Expansion Project, the Authority is now able to take action on its longstanding plans to demolish the Properties; and

WHEREAS, the condition and appearance of the some of the structures proposed to be demolished have been an issue of concern to the neighborhood surrounding the Plaza for many years, with most of the structures on the Properties ranging from structurally unsound to generally poor condition, and all of the structures except 775 Busti have not been used for residential purposes for over a decade; and

WHEREAS, as a Compact Entity, the Authority is not subject to State or local laws on matters involving its internal operations; and

WHEREAS, nonetheless, on a voluntary basis, the Authority is complying with SEQR and Section 14.09 of the New York State Parks, Recreation and Historic Preservation Law ("Section 14.09"); and

WHEREAS, voluntary compliance with these laws will ensure that no adverse significant impacts will occur as a result of the Project, and that it incorporates practicable mitigation measures to minimize any unavoidable adverse impacts; and

WHEREAS, the Project is not subject to any discretionary approval or funding from any State or local agency, such that there are no involved agencies under SEQR; and

WHEREAS, notwithstanding that there are no involved agencies, the Authority identified a number of potentially interested agencies, including the City of Buffalo Office of Strategic Planning; the City of Buffalo Department of Permit and Inspection Services; the City of Buffalo Planning Board; City of Buffalo Preservation Board ("Preservation Board"); the New York State Department of Transportation ("NYSDOT"), Region 5; the New York State Department of Environmental Conservation, Region 9; the New York State Office of Parks, Recreation & Historic Preservation ("SHPO"); and the New York State Department of State (collectively the "Interested Agencies"); and

WHEREAS, the Authority prepared Part I of a Full Environmental Assessment Form ("EAF"), pursuant to SEQR and circulated the same to the Interested Agencies along with a cover letter describing the Project and its background (the "Interested Agency Letter"); and

WHEREAS, the Authority has further caused to be prepared Parts II and III of the Full EAF, pursuant to SEQR, including appendices, covering all areas in which potential adverse environmental impacts were identified; and

WHEREAS, the Authority has thoroughly reviewed the entire EAF, including an extensive set of appendices thereto; and

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE BUFFALO AND FORT ERIE PUBLIC BRIDGE AUTHORITY AS FOLLOWS:

Section 1. Based upon a thorough review and examination of the known facts relating to the Project as well as the complete EAF with accompanying appendices, the Authority's extensive knowledge of the area surrounding the Properties, and its careful review of all potentially adverse impacts identified by the Authority, and the entire record and proceedings relating to the Project (see Section 7 for a complete list of supporting documentation), the Authority makes the following findings:

(A)    The Authority is the only involved agency and, accordingly, the Authority is undertaking an uncoordinated and voluntary review of the proposed action in conformity with the requirements of SEQR.

(B)    Prior to making a recommendation about the potential environmental significance of the Project, the Authority has reviewed the entire record before it, and has considered the list of activities which are Type I Actions outlined in Section 617.4 of the SEQR regulations, the list of activities that are Type II Actions outlined in Section 617.5 of the SEQR regulations, and the criteria for determining significance outlined in Section 617.7 of the SEQR regulations.

(C)    The Project is an Unlisted action pursuant to SEQR.

Section 2.    No potentially significant adverse impacts on the environment are noted in the EAF and none are known to the Authority.

Section 3.    Based upon the foregoing investigation of potential environmental impacts of the Project and considering both the magnitude and importance of each potential environmental impact indicated including, in particular, potential impacts to historic resources, the Authority makes the following determinations with respect to the Project:

The Project will not have a significant adverse impact on the environment. The reasons supporting this determination are as follows:

1.    The Project is limited to the Demolitions of up to eight former residential structures (and existing accessory structures) on Busti Avenue on the northern side of the block between Rhode Island and Vermont Streets and the development of open, landscaped green space. The Authority previously acquired and demolished the south half of the block almost twelve years ago. The Project will remove the blighting influence of mostly long-vacant and boarded up houses and complete the conversion of the entire block to open green space for additional buffering between the neighborhood and the Plaza.

4

2.    The Project will not, in and of itself, exceed any of the criteria contained in 6 NYCRR 617.7(c) which set forth the thresholds for determining potentially significant effects on the environment (including, for reasons stated herein, 617.7(c)(v)).

3.    The Project will not have a significant adverse impact upon land. The proposed action will remove eight structures from the Project site plus small accessory structures. The existing foundations for each structure will be completely removed below grade and the basements filled with clean soil. The site will then be graded and landscaped, and a mixture of shade and ornamental trees will be planted around the property. None of the site falls within an area with steep slopes. Soil borings completed at the adjacent plaza determined that bedrock and water tables are greater than 3 feet from the surface. Construction will be completed in much less than one year and the proposed action does not fall within a floodway. Also, the property will not be used for mining or for a landfill, and there are no unique or unusual land forms on the site. Accordingly, while the proposed action will result in a physical change to the land, such changes involving the removal of vacant structures and impervious surfaces and creation of green space will generally be beneficial. Thus, the proposed action will not have any significant adverse impacts on land.

4.    The Project will not have a significant adverse impact to water. There are no protected bodies of water or wetlands in the Project area, and the Project is not located in the Coastal Zone. However, during demolition activities, there will be a risk of erosion from exposed soils when it rains. To limit pollutants in stormwater runoff, the Authority's engineers have prepared a Storm Water Pollution Prevention Plan for the Project that includes erosion and sediment controls including, but not limited to, installing stabilized construction entrances to remove material from vehicle tires before leaving the site; installing silt fence along the down-gradient site perimeter; protecting existing drainage inlets; and using sediment trapping devices in conjunction with potential excavation dewatering activities.

5.    Following demolition activities, the proposed action will alter drainage flow or patterns at the Properties, but the change will be beneficial to the environment. Currently, a high proportion of the project site is covered with impervious surfaces, including buildings and paving (driveways and parking pads). These impervious surfaces will be converted to landscaped green space. By increasing the amount of pervious surfaces, the Demolitions will increase the amount of stormwater that will infiltrate into the ground.

6.    In summary, the Project will remove impervious surfaces from the Properties and result in improved stormwater infiltration and control over the long-term. Over the short-term, implementation of a Storm Water Pollution Prevention Plan and voluntary compliance with demolition protocols will minimize impacts from the Project. Accordingly, the proposed action will not have a significant adverse impact on waters.

7.    The Project will not have a significant adverse impact upon air quality. Any project involving demolition has the potential to affect air quality on a short-term and temporary basis due to the release of dust associated with demolition activities. As noted above, the Authority will minimize such impacts by requiring demolition contractors to

5

comply with relevant provisions of the City of Buffalo's demolition ordinance including, but not limited to, wetting all materials during demolition to minimize dust and airborne materials. Once demolition and site grading work is complete, disturbed areas will be reseeded expeditiously to prevent fugitive dust emissions from exposed soils. Accordingly, the Project will not have a significant adverse impact on air quality.

8.     The Project will not have a significant adverse impact upon plants and animals. Due to the Project's location in a developed urban area, there is minimal vegetation and wildlife at the site, consistent with a residential neighborhood with a maintained landscape. Therefore, there are no sensitive animals, plants or natural communities and/or significant habitat that will be impacted by the Project. Although the statewide database identified two endangered species on or near the Properties in the past, there have been no sightings of these species in over a hundred years. Moreover, as the site is now an urban area, it no longer supports appropriate habitat for such species. The Properties do not otherwise possess significant ecological value. Accordingly, the Project will not have a significant adverse impact upon plants and animals, including protected species.

9.     The Project is located in an urban setting and will not affect any agricultural land resources.

10.    The Project will not have a significant adverse impact upon aesthetic resources. In fact, the Demolitions are expected to result in beneficial aesthetic impacts to the neighborhood. The homes to be demolished are largely vacant and dilapidated and do not represent an aesthetic resource. Therefore, the removal of the Properties and replacement with landscaped green space will not result in a loss or significant impact to any aesthetic resource. Similarly, the Project will not result in a jarring contrast to the surrounding land uses, but instead will create an open space that blends with the neighborhood and provides a buffer from the Plaza. Accordingly, the Project will not result in any significant adverse impacts to aesthetic resources.

11.    While the Project will have an adverse impact upon historic resources, the value of the resources to be impacted is relatively low based on the current condition of the structures to be demolished and the impacts have been appropriately mitigated. Therefore, any such impacts will not be significant. Three of the structures to be demolished - 771, 777 and 793 Busti Avenue (the "NRE Properties") - were previously identified as potentially National Register eligible by SHPO. However, a 2008 study by the Department of Anthropology at SUNY Buffalo found that significant alterations to the NRE Properties over the years (by past owners), rendered these properties no longer National Register eligible under Criterion C – distinctive characteristics. Moreover, a recent study of each of these properties completed in conjunction with this environmental review similarly concluded that based on their significantly deteriorated condition, the NRE Properties do not retain sufficient integrity to be National Register eligible. Nonetheless, based on consultation with SHPO relative to the Demolitions, all three of the NRE Properties are still considered National Register eligible and one of these properties - 771 Busti (the "Wilkeson House") – has been listed as a local landmark by the City of Buffalo Preservation Board.

12.     Despite the history of NRE Properties, they all suffer from structural problems or other damage.  At 793 Busti, there has been severe water damage.  Several areas of the ceiling throughout the back portion of the house, including approximately half of the kitchen, have collapsed.  Floor boards have buckled and a bearing wall or column that supported the center support beam was removed by prior owners.  As a result, the structural integrity of the building is compromised and a 2009 Structural Report recommends that it be demolished.  Similarly, 777 Busti has suffered water leakage into the basement through the basement bulkhead door, deteriorated clapboards and sill plates, chimney damage and areas where the roofing is rotting.  Unfortunately, the structure with the most historical significance – the Wilkeson House – is also the one that is in the worst shape by far.  A number of structural evaluations; the most recent in 2009  have determined that the Wilkeson House is structurally unsound and recommends demolition. In fact, the Wilkeson House is so structurally compromised that current plans are to treat the entire demolished building as hazardous materials because it is not possible to safely enter the structure to remove asbestos and other hazardous materials prior to demolition.

13.     The Authority has implemented several actions to mitigate the impacts that the Demolitions will have upon these historic resources.  First, all of the structures were offered for free to any interested group or individual who was able to relocate them to another site. The Authority publicized this offer extensively, including postings on its website, direct mailings to the City of Buffalo, neighborhood and preservation stakeholder groups and at a public information meeting held on April 4, 2012 at the Porter Avenue Public Library.  Several individuals did contact the Authority for additional information, but no proposals were received by the closing deadline of April 26, 2012. Second, the Authority is requiring contractors to consider the use of "deconstruction" techniques during demolition.  This approach will preserve items of architectural merit, enables their use in other properties, and reduces the amount of waste that ends up in landfills.  Finally, archival studies meeting state and federal standards have been completed on each of the NRE Properties.  This action will ensure that extensive information about the NRE Properties will be preserved and archived for future generations both with SHPO and the Buffalo Historical Society.

14.     While the Authority is not subject to the SHPO consultation requirements of Section 14.09 (because it is not a State agency), it has nonetheless voluntarily consulted with SHPO with respect to the Demolitions and related mitigation measures.  By letter dated May 17, 2012, SHPO agreed that "[t]he provided materials would indicate that the buildings have reached the end of their structural life and that rehabilitation or adaptive reuse by the [Authority] would be economically and programmatically unreasonable." Thus, SHPO has concurred that demolition is appropriate for all three of the NRE Properties (although SHPO expressed sadness at the loss of the Wilkeson House).  The letter also stated that the proposed mitigation is appropriate and consistent with SHPO standards.  It is also noted that none of the properties to be demolished are within the National Register eligible Prospect Hill Historic District and all are sufficiently distant from this resource and Front Park such that demolition will not adversely affect these historic resources.  Accordingly, the Project will not have a significant adverse impact upon historic resources.

15.     The Project will not have a significant adverse impact upon archeological resources. While the area around the Plaza (including the Properties) was identified as archeologically sensitive in conjunction with a Phase IA archeological assessment prepared for the Capacity Expansion Project, the Project is largely limited to above ground activity. The only below grade activity is the removal of the foundations, which areas would have been previously disturbed when the basements were installed. Accordingly, no significant adverse impacts to archeological resources will occur.

16.     The Project will not adversely affect the quantity or quality of existing or future open spaces or recreational resources. In fact, demolition of the structures and site restoration as landscaped green space will result in the availability of additional open space for use by the neighborhood.

17.     The Project does not take place in a Critical Environmental Area and, therefore, will not impair the characteristics of a designated Critical Environmental Area.

18.     The Project will not adversely affect the existing transportation system by altering the movement of people, or otherwise impacting traffic.

19.     While the Project may result in the short term use of energy during demolition and restoration of the property, it will not result in a major change in the quantity or type of energy used.

20.     The Project will not have a significant adverse impact with respect to noise. The only potential adverse noise generated from the Project will occur during the demolition and restoration process, which is expected to last no longer than eight weeks. While noise resulting from the Project may exceed background conditions during demolition, such noise will occur solely during daytime hours when noise sensitivity is typically lowest. Also, construction activities will comply, on a voluntary basis, with applicable noise ordinances and laws. Accordingly, noise impacts will be limited, temporary and short-term, and will not have a significant adverse impact upon the environment.

21.     The Project will not result in any odor impacts.

22.     While the Demolitions will result in disposal of solid and hazardous waste from the removal of the structures, the Authority concludes that the volume of waste from 8 structures will not result in a significant adverse impact due to a substantial increase in solid waste production. In addition, as stated above, the Authority will encourage reuse ("deconstruction") of salvageable materials from the structures, which should reduce the overall amount of waste from the Demolitions.

23.     The Project will not have a significant adverse impact upon public health. The Demolitions will, on a voluntary basis, comply with all applicable laws and will implement proper protocols during the Project period to minimize potential health and safety impacts from demolition activities. With the exception of 771 Busti, all potentially asbestos containing materials and other potentially hazardous waste will be removed from the structures prior to demolition, properly packaged and disposed of in accordance with applicable laws. The entire structure at 771 Busti will be treated as an asbestos

abatement project in order to protect the health and safety of the construction workers and the community.

24.     Potential adverse impacts during the Project will also be reduced because the Authority will comply, on a voluntary basis, with the applicable provisions of the City's demolition ordinance. These requirements will include: temporary construction fencing around the entire project limits to protect the public; proper handling of asbestos; baiting of all buildings for rodents; appropriate shutting off and capping of all utilities; measures, including constant wetting of materials, during the demolition process to minimize dust and airborne particulates; standards for removal of debris and rubbish (to appropriate landfill facilities); restoration of any damage to sidewalks, curbs or streets; standards for fill materials; appropriate grading and leveling; time limits for removal of all demolition debris; and requirements for signage.

25.     Importantly, the demolition of the structures, particularly the more severely deteriorated vacant structures, will have a beneficial impact on public health and safety and the general welfare of the community. These properties represent a safety and security threat to the neighborhood. These properties have been regularly broken into, targeted for vandalism and, occasionally, more serious criminal activity. In addition, neighborhood children frequently play on the existing green space on the south side of the block in close proximity to these structures. In their current condition, these properties represent a danger to the neighborhood and anyone who might enter them. Thus, based on the current condition of these properties, the Demolitions will actually protect and improve public health and safety and improve the general welfare of the community.

26.     The Project will not have a significant adverse impact upon the growth and character of the community. While the proposed action will alter the character of the immediate neighborhood, in general, it is anticipated that these changes will be beneficial. The remaining portion of residential structures on the half block between Rhode Island and Vermont will be fully transitioned to a landscaped grassy area. The removal of the largely vacant boarded-up structures will remove their blighting influence and increase the amount of buffer between occupied residential homes on Columbus Parkway Street and operations at the Plaza. It will also create additional greenspace and recreational opportunities for neighborhood children (similar to the half block of Busti which has already been converted to greenspace). Additionally, the Project is generally consistent with City planning documents, including the City's Comprehensive Plan (*Queen City in the 21st Century*) and the City's Waterfront Corridor Initiative.

27.     With respect to the availability of the Properties to support existing uses, there is an abundant supply of housing in the area and all but one of the structures (775 Busti) has not been used for residential purposes for many years. Structural analyses support, if not require, demolition of most of the structures. Thus, the Project will not result in a significant adverse impact from the inability of the Properties to support residential use.

        Section 4.     Notwithstanding FHWA's decision to terminate the Capacity Expansion Project, the post 9-11 security and processing requirements of the U.S. entry

have resulted in a Plaza that does not function well, with lengthy delays and congestion, particularly for commercial traffic entering the United States. Accordingly, the Authority is currently considering several potential projects designed to improve traffic handling and relieve congestion in the area of the Plaza ( "Potential Plaza Projects") including (a) modifications within the Plaza such as renovations and a small addition to the existing Customs and Border Protection Commercial Building, a Bridge approach widening project and some potential modifications to Plaza egress; as well as (b) a modest expansion of the Plaza to include the Properties, the currently vacant Episcopal Church home Property and adjoining public rights of way.

SEQR requires review of an entire set of activities or steps that constitute a project, whether the agency decision-making relates to the action as a whole or to only part of it. Therefore, the Authority must carefully consider the scope of the proposed action under review. The Demolitions will convert the Properties to landscaped green space providing a buffer between the Plaza and the surrounding neighborhood. The Project has independent utility from any Potential Plaza Projects, and is functionally independent of any other actions or potential projects by the Authority. However, both actions will occur in the same geographic location. Furthermore, the Project will result in the availability of the Properties for other uses by the Authority, including possible Plaza expansion. As such, the Project and the Potential Plaza Projects could be considered sufficiently related actions pursuant to SEQR to require a single environmental review process. However, SEQR explicitly authorizes segmentation of environmental reviews provided such segmentation is warranted under the circumstances and no less protective of the environment (6 NYCRR 617.3(g)(1)).

With respect to the scope of environmental review for the Demolitions, the Authority affirmatively determines that segmentation of the environmental review for the Demolitions from the environmental review for any Potential Plaza Project is warranted under the circumstances and is no less protective of the environment. The reasons supporting this determination are as follows:

1.      Potential Plaza Projects within the existing Plaza are wide ranging and in various states of preliminary planning and design. These projects involve evaluations of Plaza access reconfiguration that would include changes to the egress from the Plaza by constructing a new ramp to allow exiting traffic to access Porter Avenue without the need to cross through the incoming traffic lanes from the I-190. It would also eliminate the traffic light at Baird Drive/Ramp A and relocate the x-ray equipment.

2.      Potential Plaza Projects involving Plaza expansion are even more preliminary with initial planning underway considering various options including rerouting the primary access road connecting outbound vehicles to the Bridge to the east of the existing Plaza, creating a smooth and uninterrupted flow of traffic from the I-190 to the Bridge; providing more adequate staging for over-width vehicles and better buffering between the Plaza and the surrounding neighborhood; and redesign and relocation of the existing Duty Free Store to a larger, more functional area on the property currently occupied by the vacant Episcopal Church Home with more adequate traffic handling and parking

facilities.

3.    In addition, while preliminary planning for Potential Plaza Projects has begun, there are many uncertainties regarding various portions of the Potential Plaza Projects which may prevent such projects from ever occurring, particularly the modest Plaza expansion. Such uncertainties include, but are not limited to: whether the City of Buffalo will be willing to abandon public rights of way within the potential Plaza expansion footprint; whether the Authority will be able to acquire other properties necessary for any Potential Plaza Projects; and/or whether NYSDOT or some other State agency will be able and/or willing to use its powers of eminent domain to assist with property acquisition in the event the Authority is unable to acquire any necessary property on its own.

4.    In contrast to Potential Plaza Projects, the Demolitions faces no uncertainty and involves no State or local agency action. Moreover, undertaking the Demolitions while the many uncertainties associated with the Potential Plaza Projects are resolved is reasonable. The Properties were acquired by the Authority with the intent of demolishing the structures and the Authority has no intent of allowing the structures to be used for residential purposes next to a poorly functioning Plaza. The Authority already acquired and demolished the properties on the other half of the same block. The proposed demolition will provide additional green space in the neighborhood and additional buffering between residents and the Plaza. In addition, several of the structures on the Properties are in advanced states of deterioration, particularly the Wilkeson House. The Demolitions will therefore remove blight and resolve existing safety issues associated with some of these structures. In general, the Project will improve the overall aesthetics and character of the neighborhood. While the Demolitions may result in the availability of the Properties for other uses by the Authority, the provision of additional buffering and green space has a long-standing and independent purpose of its own. Importantly, it is not practically determinative of whether the Authority will undertake Potential Plaza Projects in the future, if those actions are undertaken at all. Accordingly, segmentation of the environmental review for the Demolitions from any environmental review for the Potential Plaza Project is warranted under the circumstances.

5.    The second element of the segmentation analysis requires a demonstration that segmented environmental analysis is clearly no less protective of the environment than if the projects were reviewed as a single action. There are several reasons that segmentation is no less protective of the environment.

6.    First, the Demolitions and any Potential Plaza Projects have independent utility each serving a different purpose. The Demolitions will remove the blighting influence caused by the largely vacant and boarded up structures, resolve potential safety issues associated with some of the more dilapidated structures, and provide a landscaped buffer between the adjacent neighborhood. In contrast, the Potential Plaza Projects are designed to improve traffic flow and safety within the Plaza.

7.    Second, the Demolitions are in no way determinative of any of the Potential Plaza

Projects including Plaza expansion. In other words, undertaking the Demolitions does not commit the Authority to undertake any of the Potential Plaza Projects.

8. Finally (and perhaps most importantly), any future use of the Properties as part of any Potential Plaza Projects or otherwise will be the subject of a full and complete environmental review either by the Authority (on a voluntary basis similar to the Demolitions) or by another agency (to the extent Potential Plaza Projects require the involvement of a local or State agency, such agencies have an affirmative obligation to comply with SEQR. Simply stated, no potentially significant adverse impacts from the Project or the Potential Plaza Projects will escape SEQR review.

9. Accordingly, segmentation of the environmental review for the Project from any environmental reviews associated with the Potential Plaza Projects is warranted under the circumstances and is clearly no less protective of the environment.

Section 5. The Chairman and Administrative Director of the Authority are hereby authorized and directed to distribute copies of this Resolution as necessary and to do such further things or perform such acts as may be necessary or convenient to implement the provisions of this Resolution.

Section 6. This Resolution, which was adopted by a majority vote of the Board of Directors of the Authority on May 25, 2012 and shall serve as: (1) the Negative Declaration (as defined in 6 NYCRR 617.2(y)) for the Project; and (2) a determination (under 6 NYCRR 617.3(g)(1)) that segmentation is warranted and that such review is clearly no less protective of the environment (collectively, the "Determination of Significance"). This Determination of Significance is issued by the Authority, acting as lead agency pursuant to and in accordance with SEQR in an uncoordinated environmental impact review, and shall take effect immediately. This Negative Declaration has been prepared in accordance with the requirements of SEQR (Article 8 of the Environmental Conservation Law).

Section 7. The supporting documentation relied on by the Authority in issuing these determinations include:

1. Parts 1, 2 and 3 of the Full Environmental Assessment Form for the Project;
2. Project location maps;
3. Environmental Features Map (no floodplains, no wetlands);
4. Solicitation of comments directed to all potentially interested agencies;
5. City of Buffalo Demolition Protocols;
6. Sediment and Erosion Control Plan (SWPPP);
7. Map from New York State Department of Environmental Conservation "Environmental Resource Mapper";
8. Identified species per the Environmental Resources Mapper;
9. Excerpt from Final Environmental Impact Statement, Plaza Expansion Project, (A copy of the Final Environmental Impact Statement is maintained at the Authority offices);

10. Photographs and Photo-simulations (before/after);
11. Landscape Plan;
12. Planting Plan;
13. Structural Condition Inspection and Site Analysis of 757, 765, 771, 777, 783, 791 and 793 Busti Avenue, Buffalo, New York, CHA, March 2009;
14. Reuse Feasibility Study: Conclusion (A copy of the complete report is maintained at the Authority offices);
15. Architectural Integrity Summary (A copy of the complete report is maintained at the Authority offices) Phase 1A Report: Table of Contents (A copy of the complete report is maintained at the Authority offices);
16. Level II HABS/HAER documentation for 771 Busti Avenue;
17. Level II HABS/HAER documentation for 777 Busti Avenue;
18. Level II HABS/HAER documentation for 793 Busti Avenue;
19. Application for Landmark/Landmark Site (Submitted to Buffalo Preservation Board);
20. Advisory Consultation Letter from Authority to SHPO, dated April 12, 2010 (including supporting exhibits A through K);
21. Letter from SHPO to Authority, dated May 17, 2012, including approval of proposed mitigation;
22. Letter from Authority to SHPO, dated May 17, 2012;
23. Comment Letter from City of Buffalo Preservation Board, dated May 7, 2012;
24. Letter from Authority to City of Buffalo Preservation Board, dated May 18, 2012;
25. Asbestos Abatement Process Summary;
26. Pre-Demolition Surveys: 757, 765, 771, 783, 791 and 793 Busti Avenue;
27. Memorandum of Agreement: Neighborhood and Plaza Improvement Plan ("Peace Bridge Gateway Improvement");
28. Notice of Availability for Relocation dated February 27, 2012;
29. Official Public Notice dated March 12, 2012;
30. Copies of Public Information Session Boards dated April 4, 2012;
31. Sign-in Sheets: Public Information Session;
32. Comments Received: Public Information Session;
33. Comment letter from neighbor dated April 25, 2012.

Section 8. For further information on this Determination of Significance contact:

Ron Rienas, General Manager
Buffalo and Fort Erie Public Bridge Authority
1 Peace Bridge Plaza
Buffalo, NY 14213-2494
Telephone: 716-884-6744

The question of the adoption of the foregoing Resolution was duly put to a vote on roll call, which resulted as follows:

| | |
|---|---|
| Sam Hoyt, Chairman | VOTING *Yes* |
| Anthony M. Annunziata, Vice Chairman | VOTING *Yes* |
| Valerie A. Beattie | VOTING *Yes* |
| James J. Eagan | VOTING *Yes* |
| Henry J. Froese | VOTING *Yes* |
| Gerald J. Lewandowski | VOTING *Yes* |
| Michael J. Russo | VOTING *Yes* |
| Philip J. Tantillo | VOTING *Yes* |
| Anna T. Tartaglia | VOTING *Yes* |
| Rocco Vacca | VOTING *Yes* |

The foregoing Resolution was thereupon declared duly adopted.

STATE OF NEW YORK         )
                              ) SS.:

COUNTY OF ERIE   )

      I, the undersigned Secretary-Treasurer of Authority (the "Authority"), do hereby certify that I have compared the foregoing extract of the minutes of the meeting of the members of the Authority, including the Resolution contained therein, held on May 25, 2012, with the original thereof on file in my office, and that the same is a true and correct copy of said original and of such Resolution set forth therein and of the whole of said original so far as the same relates to the subject matters therein referred to.

      I FURTHER CERTIFY that, as of the date hereof, the attached Resolution is in full force and effect and has not been amended, repealed or rescinded.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Authority this 25 day of May 2012.

                               Ron Rienas, Secretary-Treasurer

(SEAL)

*617.20*
*Appendix A*
*State Environmental Quality Review*
**FULL ENVIRONMENTAL ASSESSMENT FORM**

**Purpose:** The full EAF is designed to help applicants and agencies determine, in an orderly manner, whether a project or action may be significant. The question of whether an action may be significant is not always easy to answer. Frequently, there are aspects of a project that are subjective or unmeasurable. It is also understood that those who determine significance may have little or no formal knowledge of the environment or may not be technically expert in environmental analysis. In addition, many who have knowledge in one particular area may not be aware of the broader concerns affecting the question of significance.

The full EAF is intended to provide a method whereby applicants and agencies can be assured that the determination process has been orderly, comprehensive in nature, yet flexible enough to allow introduction of information to fit a project or action.

**Full EAF Components:** The full EAF is comprised of three parts:

**Part 1:** Provides objective data and information about a given project and its site. By identifying basic project data, it assists a reviewer in the analysis that takes place in Parts 2 and 3.

**Part 2:** Focuses on identifying the range of possible impacts that may occur from a project or action. It provides guidance as to whether an impact is likely to be considered small to moderate or whether it is a potentially-large impact. The form also identifies whether an impact can be mitigated or reduced.

**Part 3:** If any impact in Part 2 is identified as potentially-large, then Part 3 is used to evaluate whether or not the impact is actually important.

---

## THIS AREA FOR <u>LEAD AGENCY</u> USE ONLY

## DETERMINATION OF SIGNIFICANCE -- Type 1 and Unlisted Actions

**Identify the Portions of EAF completed for this project:**   ☑ Part 1   ☑ Part 2   ☑ Part 3

Upon review of the information recorded on this EAF (Parts 1 and 2 and 3 if appropriate), and any other supporting information, and considering both the magnitude and importance of each impact, it is reasonably determined by the lead agency that:

☑ **A.** The project will not result in any large and important impact(s) and, therefore, is one which will not have a significant impact on the environment, therefore a **negative declaration will be prepared.**

☐ **B.** Although the project could have a significant effect on the environment, there will not be a significant effect for this Unlisted Action because the mitigation measures described in PART 3 have been required, therefore a **CONDITIONED negative declaration will be prepared.** *

☐ **C.** The project may result in one or more large and important impacts that may have a significant impact on the environment, therefore a **positive declaration will be prepared.**

*A Conditioned Negative Declaration is only valid for Unlisted Actions

Demolition and site restoration of properties on Busti Avenue

_____
Name of Action

Buffalo & Fort Erie Public Bridge Authority

_____
Name of Lead Agency

Ron Rienas                                           General Manager
_____             _____
Print or Type Name of Responsible Officer in Lead Agency    Title of Responsible Officer

                                                              (wendel)
_____             _____
Signature of Responsible Officer in Lead Agency    Signature of Preparer (if different from responsible officer)

website                        6/5/12
                          _____
                               Date

**Page 1 of 21**

## PART 1--PROJECT INFORMATION
### Prepared by Project Sponsor

NOTICE: This document is designed to assist in determining whether the action proposed may have a significant effect on the environment. Please complete the entire form, Parts A through E. Answers to these questions will be considered as part of the application for approval and may be subject to further verification and public review. Provide any additional information you believe will be needed to complete Parts 2 and 3.

It is expected that completion of the full EAF will be dependent on information currently available and will not involve new studies, research or investigation. If information requiring such additional work is unavailable, so indicate and specify each instance.

Name of Action __Demolition and site restoration of Properties on Busti Avenue__

Location of Action (include Street Address, Municipality and County)

__757, 765, 771, 777, 783, 791 & 793 Busti Avenue, City of Buffalo, Erie County, NY__

Name of Applicant/Sponsor __Buffalo & Fort Erie Public Bridge Authority__

Address __1 Peace Bridge Plaza__

City / PO __Buffalo__ State __NY__ Zip Code __14213__

Business Telephone __(716) 884-8636__

Name of Owner (if different) __same__

Address _____

City / PO _____ State _____ Zip Code _____

Business Telephone _____

Description of Action:

> The proposed action is the demolition of 7 vacant and dilapidated residential structures located on Busti Avenue in the City of Buffalo. The action includes full removal of all basements and site restoration. Three of the properties are eligible for listing as historic structures on the National Register. One of the three properties (771 Busti) has been designated locally historic.

**Please Complete Each Question--Indicate N.A. if not applicable**

## A. SITE DESCRIPTION
Physical setting of overall project, both developed and undeveloped areas.

1.  Present Land Use: ☑ Urban  ☐ Industrial  ☐ Commercial  ☐ Residential (suburban)  ☐ Rural (non-farm)
    ☐ Forest  ☐ Agriculture  ☐ Other _____

2.  Total acreage of project area: _____2___ acres.  approximately

| APPROXIMATE ACREAGE | PRESENTLY | AFTER COMPLETION |
|---|---|---|
| Meadow or Brushland (Non-agricultural) | 0 acres | 0 acres |
| Forested | 0 acres | 0 acres |
| Agricultural (Includes orchards, cropland, pasture, etc.) | 0 acres | 0 acres |
| Wetland (Freshwater or tidal as per Articles 24,25 of ECL) | 0 acres | 0 acres |
| Water Surface Area | 0 acres | 0 acres |
| Unvegetated (Rock, earth or fill) | 0 acres | 0 acres |
| Roads, buildings and other paved surfaces | .6 acres | 0 acres |
| Other (Indicate type) __Lawn/Landscaping_____ | 1.4 acres | 2 acres |

3.  What is predominant soil type(s) on project site? __Urban land_____

    a.  Soil drainage:  ☐ Well drained ____% of site  ☑ Moderately well drained _100_% of site.  per Erie Co. GIS mapper
    ☐ Poorly drained _____% of site

    b.  If any agricultural land is involved, how many acres of soil are classified within soil group 1 through 4 of the NYS Land Classification System? _____N/A___ acres (see 1 NYCRR 370).

4.  Are there bedrock outcroppings on project site?  ☐ Yes  ☑ No

    a.  What is depth to bedrock _____310'__ (in feet) per soil borings on adjacent bridge plaza

5.  Approximate percentage of proposed project site with slopes:
    ☑ 0-10% _100_%  ☐ 10- 15%_____%  ☐ 15% or greater _____%

6.  Is project substantially contiguous to, or contain a building, site, or district, listed on the State or National Registers of Historic Places?  ☐ Yes  ☑ No

7.  Is project substantially contiguous to a site listed on the Register of National Natural Landmarks?  ☐ Yes  ☑ No

8.  What is the depth of the water table? _____≥ 8'__ (in feet)  per soil borings on adjacent bridge plaza

9.  Is site located over a primary, principal, or sole source aquifer?  ☐ Yes  ☑ No

10. Do hunting, fishing or shell fishing opportunities presently exist in the project area?  ☐ Yes  ☑ No

11. Does project site contain any species of plant or animal life that is identified as threatened or endangered? ☐ Yes ☑ No

According to:

Prior Environmental Impact Statement for Peace Bridge Expansion Project (Appendix N)

Identify each species:

12. Are there any unique or unusual land forms on the project site? (i.e., cliffs, dunes, other geological formations?

☐ Yes ☑ No

Describe:

13. Is the project site presently used by the community or neighborhood as an open space or recreation area?

☐ Yes ☑ No

If yes, explain:

14. Does the present site include scenic views known to be important to the community? ☐ Yes ☑ No

15. Streams within or contiguous to project area:

Niagara River

a. Name of Stream and name of River to which it is tributary

Niagara River

16. Lakes, ponds, wetland areas within or contiguous to project area:

None

b. Size (in acres):

N/A

17. Is the site served by existing public utilities? ☒ Yes ☐ No

    a. If YES, does sufficient capacity exist to allow connection? N/A ☐ Yes ☐ No

    b. If YES, will improvements be necessary to allow connection? N/A ☐ Yes ☐ No

18. Is the site located in an agricultural district certified pursuant to Agriculture and Markets Law, Article 25-AA, Section 303 and 304? ☐ Yes ☒ No

19. Is the site located in or substantially contiguous to a Critical Environmental Area designated pursuant to Article 8 of the ECL, and 6 NYCRR 617? ☐ Yes ☒ No

20. Has the site ever been used for the disposal of solid or hazardous wastes? ☐ Yes ☒ No

**B. Project Description**

1. Physical dimensions and scale of project (fill in dimensions as appropriate).

    a. Total contiguous acreage owned or controlled by project sponsor: ___16.94___ acres.

    b. Project acreage to be developed: ___NA___ acres initially; ___NA___ acres ultimately.

    c. Project acreage to remain undeveloped: ___NA___ acres.

    d. Length of project, in miles: ___NA___ (if appropriate)

    e. If the project is an expansion, indicate percent of expansion proposed. ___NA___ %

    f. Number of off-street parking spaces existing ___driveways___; proposed ___0___

    g. Maximum vehicular trips generated per hour: ___0___ (upon completion of project)?

    h. If residential: Number and type of housing units: (Demolishing 7 residential structures)

| | One Family | Two Family | Multiple Family | Condominium |
|---|---|---|---|---|
| Initially | | | | |
| Ultimately | | | | |

    i. Dimensions (in feet) of largest proposed structure: ___NA___ height; ___NA___ width; ___NA___ length.

    j. Linear feet of frontage along a public thoroughfare project will occupy is? ___400___ ft.

2. How much natural material (i.e. rock, earth, etc.) will be removed from the site? ___0___ tons/cubic yards.

3. Will disturbed areas be reclaimed ☒ Yes ☐ No ☐ N/A

    a. If yes, for what intended purpose is the site being reclaimed?

    | lawn/landscape area |
    |---|

    b. Will topsoil be stockpiled for reclamation? ☒ Yes ☐ No

    c. Will upper subsoil be stockpiled for reclamation? ☒ Yes ☐ No

4. How many acres of vegetation (trees, shrubs, ground covers) will be removed from site? ___0___ acres.

5. Will any mature forest (over 100 years old) or other locally-important vegetation be removed by this project?

☐ Yes    ☒ No

6. If single phase project: Anticipated period of construction: _2___ months, (including demolition)

7. If multi-phased:  N/A

    a.  Total number of phases anticipated _____ (number)

    b.  Anticipated date of commencement phase 1: _____ month _____ year, (including demolition)

    c.  Approximate completion date of final phase: _____ month _____ year.

    d.  Is phase 1 functionally dependent on subsequent phases? ☐ Yes ☐ No

8. Will blasting occur during construction? ☐ Yes ☒ No

9. Number of jobs generated: during construction _10__ ; after project is complete _0____

10. Number of jobs eliminated by this project _0_____ .

11. Will project require relocation of any projects or facilities? ☐ Yes ☒ No

    If yes, explain:

    | |
    

12. Is surface liquid waste disposal involved? ☐ Yes ☒ No

    a.  If yes, indicate type of waste (sewage, industrial, etc) and amount _____

    b.  Name of water body into which effluent will be discharged _____

13. Is subsurface liquid waste disposal involved? ☐ Yes ☒ No    Type _____

14. Will surface area of an existing water body increase or decrease by proposal? ☐ Yes ☒ No

    If yes, explain:

15. Is project or any portion of project located in a 100 year flood plain? ☐ Yes ☒ No

16. Will the project generate solid waste? ☒ Yes ☐ No

    a.  If yes, what is the amount per month? __1,800__ tons    one time (demolition)

    b.  If yes, will an existing solid waste facility be used? ☒ Yes ☐ No

    c.  If yes, give name  Approved Part 360 Facility              ; location  TBD _____

    d.  Will any wastes not go into a sewage disposal system or into a sanitary landfill? ☒ Yes ☐ No

e.   If yes, explain:

To the greatest extent feasible, materials will be recycled, including architectural salvage where feasible

17. Will the project involve the disposal of solid waste? ☐ Yes ☒ No

    a.   If yes, what is the anticipated rate of disposal? _____ tons/month.

    b.   If yes, what is the anticipated site life? _____ years.

18. Will project use herbicides or pesticides? ☐ Yes ☒ No

19. Will project routinely produce odors (more than one hour per day)? ☐ Yes ☒ No

20. Will project produce operating noise exceeding the local ambient noise levels? ☒ Yes ☐ No   during demolition

21. Will project result in an increase in energy use? ☐ Yes ☒ No

    If yes, indicate type(s)

22. If water supply is from wells, indicate pumping capacity _____ gallons/minute.   N/A

23. Total anticipated water usage per day _____ gallons/day.  N/A

24. Does project involve Local, State or Federal funding? ☐ Yes ☒ No

    If yes, explain:

**25. Approvals Required:** NONE

|  | | | | Type | Submittal Date |
|---|---|---|---|---|---|
| City, Town, Village Board | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |
| City, Town, Village Planning Board | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |
| City, Town Zoning Board | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |
| City, County Health Department | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |
| Other Local Agencies | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |
| Other Regional Agencies | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |
| State Agencies | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |
| Federal Agencies | ☐ Yes | ☐ No | | _____ | _____ |
| | | | | _____ | _____ |
| | | | | _____ | _____ |

**C. Zoning and Planning Information**

1. Does proposed action involve a planning or zoning decision? ☐ Yes ☑ No

   If Yes, indicate decision required:

   ☐ Zoning amendment  ☐ Zoning variance  ☐ New/revision of master plan  ☐ Subdivision

   ☐ Site plan  ☐ Special use permit  ☐ Resource management plan  ☐ Other

2. What is the zoning classification(s) of the site?

> PB - Porter Business District

3. What is the maximum potential development of the site if developed as permitted by the present zoning?

> As per zoning

4. What is the proposed zoning of the site?

> PB - Porter Business District

5. What is the maximum potential development of the site if developed as permitted by the proposed zoning?

> same

6. Is the proposed action consistent with the recommended uses in adopted local land use plans?   ☒ Yes   ☐ No

7. What are the predominant land use(s) and zoning classifications within a ¼ mile radius of proposed action?

> Residential, Institutional, Open space, Commercial and International Border Crossing Facility

8. Is the proposed action compatible with adjoining/surrounding land uses with a ¼ mile?   ☒ Yes   ☐ No

9. If the proposed action is the subdivision of land, how many lots are proposed?   N/A

    a. What is the minimum lot size proposed?  _____

10. Will proposed action require any authorization(s) for the formation of sewer or water districts? ☐ Yes ☒ No

11. Will the proposed action create a demand for any community provided services (recreation, education, police, fire protection?

☐ Yes  ☒ No

a. If yes, is existing capacity sufficient to handle projected demand? ☐ Yes ☐ No

12. Will the proposed action result in the generation of traffic significantly above present levels? ☐ Yes ☒ No

a. If yes, is the existing road network adequate to handle the additional traffic. ☐ Yes ☐ No

D. **Informational Details**

Attach any additional information as may be needed to clarify your project. If there are or may be any adverse impacts associated with your proposal, please discuss such impacts and the measures which you propose to mitigate or avoid them.

E. **Verification**

I certify that the information provided above is true to the best of my knowledge.

Applicant/Sponsor Name  Anthony Braunscheidel                     Date  4-10-2012

Signature

Title  Facility & Operations Manager, Bflo & Ft. Erie Public Bridge Authority

**If the action is in the Coastal Area, and you are a state agency, complete the Coastal Assessment Form before proceeding with this assessment.**

## PART 2 - PROJECT IMPACTS AND THEIR MAGNITUDE
### Responsibility of Lead Agency

**General Information** (Read Carefully)
!    In completing the form the reviewer should be guided by the question: Have my responses and determinations been **reasonable?** The reviewer is not expected to be an expert environmental analyst.
!    The **Examples** provided are to assist the reviewer by showing types of impacts and wherever possible the threshold of magnitude that would trigger a response in column 2.  The examples are generally applicable throughout the State and for most situations.  But, for any specific project or site other examples and/or lower thresholds may be appropriate for a Potential Large Impact response, thus requiring evaluation in Part 3.
!    The impacts of each project, on each site, in each locality, will vary.  Therefore, the examples are illustrative and have been offered as guidance.  They do not constitute an exhaustive list of impacts and thresholds to answer each question.
!    The number of examples per question does not indicate the importance of each question.
!    In identifying impacts, consider long term, short term and cumulative effects.

**Instructions** (Read carefully)
a.    Answer each of the 20 questions in PART 2.  Answer **Yes** if there will be **any** impact.
b.    **Maybe** answers should be considered as **Yes** answers.
c.    If answering **Yes** to a question then check the appropriate box(column 1 or 2)to indicate the potential size of the impact. If impact threshold equals or exceeds any example provided, check column 2.  If impact will occur but threshold is lower than example, check column 1.
d.    Identifying that an impact will be potentially large (column 2) does not mean that it is also necessarily **significant**.  Any large impact must be evaluated in PART 3 to determine significance.  Identifying an impact in column 2 simply asks that it be looked at further.
e.    If reviewer has doubt about size of the impact then consider the impact as potentially large and proceed to PART 3.
f.    If a potentially large impact checked in column 2 can be mitigated by change(s) in the project to a small to moderate impact, also check the **Yes** box in column 3.  A **No** response indicates that such a reduction is not possible.  This must be explained in Part 3.

| | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|---|---|

### Impact on Land

1.  Will the Proposed Action result in a physical change to the project site?

    NO ☐    YES ☒

| **Examples** that would apply to column 2 | 1 | 2 | 3 |
|---|---|---|---|
| • Any construction on slopes of 15% or greater, (15 foot rise per 100 foot of length), or where the general slopes in the project area exceed 10%. | ☐ | ☐ | ☐ Yes ☐ No |
| • Construction on land where the depth to the water table is less than 3 feet. | ☐ | ☐ | ☐ Yes ☐ No |
| • Construction of paved parking area for 1,000 or more vehicles. | ☐ | ☐ | ☐ Yes ☐ No |
| • Construction on land where bedrock is exposed or generally within 3 feet of existing ground surface. | ☐ | ☐ | ☐ Yes ☐ No |
| • Construction that will continue for more than 1 year or involve more than one phase or stage. | ☐ | ☐ | ☐ Yes ☐ No |
| • Excavation for mining purposes that would remove more than 1,000 tons of natural material (i.e., rock or soil) per year. | ☐ | ☐ | ☐ Yes ☐ No |

|  | | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|:---:|:---:|:---:|
| • | Construction or expansion of a santary landfill. | ☐ | ☐ | ☐ Yes ☐ No |
| • | Construction in a designated floodway. | ☐ | ☐ | ☐ Yes ☐ No |
| • | Other impacts: | ☑ | ☐ | ☐ Yes ☐ No |

> Demolition of eight vacant residentail structures and site restoration will result in a physical change to the site. See Part 3 for more details.

2. Will there be an effect to any unique or unusual land forms found on the site? (i.e., cliffs, dunes, geological formations, etc.)

   ☑ NO   ☐ YES

| • | Specific land forms: | ☐ | ☐ | ☐ Yes ☐ No |
|---|---|:---:|:---:|:---:|

> 

**Impact on Water**

3. Will Proposed Action affect any water body designated as protected? (Under Articles 15, 24, 25 of the Environmental Conservation Law, ECL)

   ☑ NO   ☐ YES

**Examples** that would apply to column 2

| • | Developable area of site contains a protected water body. | ☐ | ☐ | ☐ Yes ☐ No |
|---|---|:---:|:---:|:---:|
| • | Dredging more than 100 cubic yards of material from channel of a protected stream. | ☐ | ☐ | ☐ Yes ☐ No |
| • | Extension of utility distribution facilities through a protected water body. | ☐ | ☐ | ☐ Yes ☐ No |
| • | Construction in a designated freshwater or tidal wetland. | ☐ | ☐ | ☐ Yes ☐ No |
| • | Other impacts: | ☐ | ☐ | ☐ Yes ☐ No |

> 

4. Will Proposed Action affect any non-protected existing or new body of water?

   ☑ NO   ☐ YES

**Examples** that would apply to column 2

| • | A 10% increase or decrease in the surface area of any body of water or more than a 10 acre increase or decrease. | ☐ | ☐ | ☐ Yes ☐ No |
|---|---|:---:|:---:|:---:|
| • | Construction of a body of water that exceeds 10 acres of surface area. | ☐ | ☐ | ☐ Yes ☐ No |
| • | Other impacts: | ☐ | ☐ | ☐ Yes ☐ No |

>

|  | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|---|---|

5. Will Proposed Action affect surface or groundwater quality or quantity?

☒ NO ☐ YES

**Examples** that would apply to column 2

| | 1 | 2 | 3 |
|---|---|---|---|
| • Proposed Action will require a discharge permit. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action requires use of a source of water that does not have approval to serve proposed (project) action. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action requires water supply from wells with greater than 45 gallons per minute pumping capacity. | ☐ | ☐ | ☐ Yes ☐ No |
| • Construction or operation causing any contamination of a water supply system. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will adversely affect groundwater. | ☐ | ☐ | ☐ Yes ☐ No |
| • Liquid effluent will be conveyed off the site to facilities which presently do not exist or have inadequate capacity. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action would use water in excess of 20,000 gallons per day. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will likely cause siltation or other discharge into an existing body of water to the extent that there will be an obvious visual contrast to natural conditions. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will require the storage of petroleum or chemical products greater than 1,100 gallons. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will allow residential uses in areas without water and/or sewer services. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action locates commercial and/or industrial uses which may require new or expansion of existing waste treatment and/or storage facilities. | ☐ | ☐ | ☐ Yes ☐ No |
| • Other impacts: | ☐ | ☐ | ☐ Yes ☐ No |

| | 1 Small to Moderate Impact | 2 Potential Large Impact | 3 Can Impact Be Mitigated by Project Change | |
|---|:---:|:---:|:---:|:---:|

6. Will Proposed Action alter drainage flow or patterns, or surface water runoff?

☐ NO   ☒ YES

**Examples** that would apply to column 2

| | 1 | 2 | 3 | |
|---|:---:|:---:|:---:|:---:|
| • Proposed Action would change flood water flows | ☐ | ☐ | ☐ Yes | ☐ No |
| • Proposed Action may cause substantial erosion. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Proposed Action is incompatible with existing drainage patterns. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Proposed Action will allow development in a designated floodway. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Other impacts: | ☒ | ☐ | ☐ Yes | ☐ No |

> Beneficial impact because existing impervious surfaces will be removed from the site allowing stormwater to percolate into the soils and thereby reducing stormwater runoff.

### IMPACT ON AIR

7. Will Proposed Action affect air quality?

☐ NO   ☒ YES

**Examples** that would apply to column 2

| | 1 | 2 | 3 | |
|---|:---:|:---:|:---:|:---:|
| • Proposed Action will induce 1,000 or more vehicle trips in any given hour. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Proposed Action will result in the incineration of more than 1 ton of refuse per hour. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Emission rate of total contaminants will exceed 5 lbs. per hour or a heat source producing more than 10 million BTU's per hour. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Proposed Action will allow an increase in the amount of land committed to industrial use. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Proposed Action will allow an increase in the density of industrial development within existing industrial areas. | ☐ | ☐ | ☐ Yes | ☐ No |
| • Other impacts: | ☒ | ☐ | ☐ Yes | ☐ No |

> Dust from demolition will be controlled through watering/demolition protocols. See Part 3 for more details.

### IMPACT ON PLANTS AND ANIMALS

8. Will Proposed Action affect any threatened or endangered species? See Part 3

☒ NO   ☐ YES

**Examples** that would apply to column 2

| | 1 | 2 | 3 | |
|---|:---:|:---:|:---:|:---:|
| • Reduction of one or more species listed on the New York or Federal list, using the site, over or near the site, or found on the site. | ☐ | ☐ | ☐ Yes | ☐ No |

| | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|---|---|

- Removal of any portion of a critical or significant wildlife habitat.  ☐  ☐  ☐ Yes ☐ No

- Application of pesticide or herbicide more than twice a year, other than for agricultural purposes.  ☐  ☐  ☐ Yes ☐ No

- Other impacts:  ☐  ☐  ☐ Yes ☐ No

> Site was identified as being within habitat area but its developed nature makes use by threatened or endangered species unrealistic. See Part 3 for more details.

9. Will Proposed Action substantially affect non-threatened or non-endangered species?

☐■ NO    ☐ YES

**Examples** that would apply to column 2
- Proposed Action would substantially interfere with any resident or migratory fish, shellfish or wildlife species.  ☐  ☐  ☐ Yes ☐ No

- Proposed Action requires the removal of more than 10 acres of mature forest (over 100 years of age) or other locally important vegetation.  ☐  ☐  ☐ Yes ☐ No

- Other impacts:  ☐  ☐  ☐ Yes ☐ No

**IMPACT ON AGRICULTURAL LAND RESOURCES**

10. Will Proposed Action affect agricultural land resources?

☐■ NO    ☐ YES

**Examples** that would apply to column 2
- The Proposed Action would sever, cross or limit access to agricultural land (includes cropland, hayfields, pasture, vineyard, orchard, etc.)  ☐  ☐  ☐ Yes ☐ No

- Construction activity would excavate or compact the soil profile of agricultural land.  ☐  ☐  ☐ Yes ☐ No

- The Proposed Action would irreversibly convert more than 10 acres of agricultural land or, if located in an Agricultural District, more than 2.5 acres of agricultural land.  ☐  ☐  ☐ Yes ☐ No

| | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|---|---|
| • The Proposed Action would disrupt or prevent installation of agricultural land management systems (e.g., subsurface drain lines, outlet ditches, strip cropping); or create a need for such measures (e.g. cause a farm field to drain poorly due to increased runoff). | ☐ | ☐ | ☐ Yes ☐ No |
| • Other impacts: | ☐ | ☐ | ☐ Yes ☐ No |

**IMPACT ON AESTHETIC RESOURCES**

11. Will Proposed Action affect aesthetic resources? (If necessary, use the Visual EAF Addendum in Section 617.20, Appendix B.)
☐ NO   ☑ YES

**Examples** that would apply to column 2

| | 1 | 2 | 3 |
|---|---|---|---|
| • Proposed land uses, or project components obviously different from or in sharp contrast to current surrounding land use patterns, whether man-made or natural. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed land uses, or project components visible to users of aesthetic resources which will eliminate or significantly reduce their enjoyment of the aesthetic qualities of that resource. | ☐ | ☐ | ☐ Yes ☐ No |
| • Project components that will result in the elimination or significant screening of scenic views known to be important to the area. | ☐ | ☐ | ☐ Yes ☐ No |
| • Other impacts: | ☑ | ☐ | ☐ Yes ☐ No |

Removal of existing structures

**IMPACT ON HISTORIC AND ARCHAEOLOGICAL RESOURCES**

12. Will Proposed Action impact any site or structure of historic, prehistoric or paleontological importance?
☐ NO   ☑ YES

**Examples** that would apply to column 2

| | 1 | 2 | 3 |
|---|---|---|---|
| • Proposed Action occurring wholly or partially within or substantially contiguous to any facility or site listed on the State or National Register of historic places. | ☐ | ☐ | ☐ Yes ☐ No |
| • Any impact to an archaeological site or fossil bed located within the project site. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will occur in an area designated as sensitive for archaeological sites on the NYS Site Inventory. | ☐ | ☐ | ☐ Yes ☐ No |

|  | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|---|---|
| • Other impacts: | ■ | ☐ | ☐ Yes ☐ No |

Project will result in removal of a locally significant structure. See Part 3 for more details.

### IMPACT ON OPEN SPACE AND RECREATION

13. Will proposed Action affect the quantity or quality of existing or future open spaces or recreational opportunities?
   ■ NO   ☐ YES

**Examples** that would apply to column 2

| | | | |
|---|---|---|---|
| • The permanent foreclosure of a future recreational opportunity. | ☐ | ☐ | ☐ Yes ☐ No |
| • A major reduction of an open space important to the community. | ☐ | ☐ | ☐ Yes ☐ No |
| • Other impacts: | ☐ | ☐ | ☐ Yes ☐ No |

### IMPACT ON CRITICAL ENVIRONMENTAL AREAS

14. Will Proposed Action impact the exceptional or unique characteristics of a critical environmental area (CEA) established pursuant to subdivision 6NYCRR 617.14(g)?
   ■ NO   ☐ YES

List the environmental characteristics that caused the designation of the CEA.

**Examples** that would apply to column 2

| | | | |
|---|---|---|---|
| • Proposed Action to locate within the CEA? | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will result in a reduction in the quantity of the resource? | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will result in a reduction in the quality of the resource? | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will impact the use, function or enjoyment of the resource? | ☐ | ☐ | ☐ Yes ☐ No |
| • Other impacts: | ☐ | ☐ | ☐ Yes ☐ No |

|  | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|---|---|

### IMPACT ON TRANSPORTATION

15. Will there be an effect to existing transportation systems?

☑ NO  ☐ YES

**Examples** that would apply to column 2

| | | | |
|---|---|---|---|
| • Alteration of present patterns of movement of people and/or goods. | ☐ | ☐ | ☐ Yes  ☐ No |
| • Proposed Action will result in major traffic problems. | ☐ | ☐ | ☐ Yes  ☐ No |
| • Other impacts: | ☐ | ☐ | ☐ Yes  ☐ No |

### IMPACT ON ENERGY

16. Will Proposed Action affect the community's sources of fuel or energy supply?

☑ NO  ☐ YES

**Examples** that would apply to column 2

| | | | |
|---|---|---|---|
| • Proposed Action will cause a greater than 5% increase in the use of any form of energy in the municipality. | ☐ | ☐ | ☐ Yes  ☐ No |
| • Proposed Action will require the creation or extension of an energy transmission or supply system to serve more than 50 single or two family residences or to serve a major commercial or industrial use. | ☐ | ☐ | ☐ Yes  ☐ No |
| • Other impacts: | ☐ | ☐ | ☐ Yes  ☐ No |

### NOISE AND ODOR IMPACT

17. Will there be objectionable odors, noise, or vibration as a result of the Proposed Action?

☐ NO  ☑ YES

**Examples** that would apply to column 2

| | | | |
|---|---|---|---|
| • Blasting within 1,500 feet of a hospital, school or other sensitive facility. | ☐ | ☐ | ☐ Yes  ☐ No |
| • Odors will occur routinely (more than one hour per day). | ☐ | ☐ | ☐ Yes  ☐ No |
| • Proposed Action will produce operating noise exceeding the local ambient noise levels for noise outside of structures. | ☐ | ☐ | ☐ Yes  ☐ No |
| • Proposed Action will remove natural barriers that would act as a noise screen. | ☐ | ☐ | ☐ Yes  ☐ No |
| • Other impacts: | ☑ | ☐ | ☐ Yes  ☐ No |

Temporary noise impacts during demolition. See Part 3 for more details.

|  | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|---|---|---|

### IMPACT ON PUBLIC HEALTH

18. Will Proposed Action affect public health and safety?

☐ NO ☑ YES

| | | | |
|---|---|---|---|
| • Proposed Action may cause a risk of explosion or release of hazardous substances (i.e. oil, pesticides, chemicals, radiation, etc.) in the event of accident or upset conditions, or there may be a chronic low level discharge or emission. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action may result in the burial of "hazardous wastes" in any form (i.e. toxic, poisonous, highly reactive, radioactive, irritating, infectious, etc.) | ☐ | ☐ | ☐ Yes ☐ No |
| • Storage facilities for one million or more gallons of liquefied natural gas or other flammable liquids. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action may result in the excavation or other disturbance within 2,000 feet of a site used for the disposal of solid or hazardous waste. | ☐ | ☐ | ☐ Yes ☐ No |
| • Other impacts: | ☑ | ☐ | ☐ Yes ☐ No |

Removal of asbestos prior to demolition

### IMPACT ON GROWTH AND CHARACTER
### OF COMMUNITY OR NEIGHBORHOOD

19. Will Proposed Action affect the character of the existing community?

☐ NO ☑ YES

**Examples** that would apply to column 2

| | | | |
|---|---|---|---|
| • The permanent population of the city, town or village in which the project is located is likely to grow by more than 5%. | ☐ | ☐ | ☐ Yes ☐ No |
| • The municipal budget for capital expenditures or operating services will increase by more than 5% per year as a result of this project. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will conflict with officially adopted plans or goals. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will cause a change in the density of land use. | ☑ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will replace or eliminate existing facilities, structures or areas of historic importance to the community. | ☑ | ☐ | ☐ Yes ☐ No |
| • Development will create a demand for additional community services (e.g. schools, police and fire, etc.) | ☐ | ☐ | ☐ Yes ☐ No |

|  | 1<br>Small to<br>Moderate<br>Impact | 2<br>Potential<br>Large<br>Impact | 3<br>Can Impact Be<br>Mitigated by<br>Project Change |
|---|:---:|:---:|:---:|
| • Proposed Action will set an important precedent for future projects. | ☐ | ☐ | ☐ Yes ☐ No |
| • Proposed Action will create or eliminate employment. | ☐ | ☐ | ☐ Yes ☐ No |
| • Other impacts: | ☐ | ☐ | ☐ Yes ☐ No |

20. Is there, or is there likely to be, public controversy related to potential adverse environment impacts?
☐ NO ☒ YES

**If Any Action in Part 2 Is Identified as a Potential Large Impact or If you Cannot Determine the Magnitude of Impact, Proceed to Part 3**

## Part 3 - EVALUATION OF THE IMPORTANCE OF IMPACTS

### Responsibility of Lead Agency

Part 3 must be prepared if one or more impact(s) is considered to be potentially large, even if the impact(s) may be mitigated.

<u>Instructions</u> (If you need more space, attach additional sheets)

Discuss the following for each impact identified in Column 2 of Part 2:

1.  Briefly describe the impact.

2.  Describe (if applicable) how the impact could be mitigated or reduced to a small to moderate impact by project change(s).

3.  Based on the information available, decide if it is reasonable to conclude that this impact is **important**.

    To answer the question of importance, consider:

        ! The probability of the impact occurring
        ! The duration of the impact
        ! Its irreversibility, including permanently lost resources of value
        ! Whether the impact can or will be controlled
        ! The regional consequence of the impact
        ! Its potential divergence from local needs and goals
        ! Whether known objections to the project relate to this impact.



Reset

# SEQR EAF: PART 3

Although each of the potential impacts to the environment associated with the proposed action have been identified as small to moderate on Part 2 of the EAF, Part 3 of the EAF provides an impact analysis for each of the 20 questions on Part 2 which was answered with a "yes". The purposes of this Part 3 analysis is to provide interested agencies, stakeholders and the public with a clear understanding of the areas of environmental concern and the likelihood and severity of potential impacts associated with such areas of concern.

It is noted that there has been a small modification to the proposed action since Part 1 of the EAF was prepared and circulated to potentially interested agencies. As originally contemplated, the proposed action involved the demolition of seven vacant and former residential structures in various states of deterioration which the Authority acquired between 1995 and 1998 on Busti Avenue on the north half of the block between Rhode Island and Vermont Streets. The Authority previously acquired and demolished the south half of the same block almost 12 years ago. There is one parcel on this block which the Authority does not own. However, over the last few weeks, the Authority has been in discussions with the owner of this property, making the owner a formal purchase offer, which the owner has accepted. As a result, the structure located at 775 Busti Avenue will be demolished as well, making the entire block open green space. Thus, the proposed action has been modified to include acquisition and demolition of 775 Busti Avenue.

## EVALUATION OF THE IMPORTANCE OF IMPACTS

### Impact on Land

*Proposed Action will result in a physical change to the project site.*

The proposed action will remove eight vacant structures from the project site. The existing foundations for each structure will be completely removed below grade and the basements filled with clean soil. The site will then be graded and landscaped, and a mixture of shade and ornamental trees will be planted around the property. Currently, a high proportion of the area is covered with impervious surfaces, including buildings and paving (driveways and parking pads). These impervious surfaces will be converted to landscaped green space. None of the site falls within an area with steep slopes. Soil borings completed at

the adjacent plaza determined that bedrock and water tables are greater than 3 feet from the surface. Construction will be completed in much less than one year and the proposed action does not fall within a floodway. Also, the property will not be used for mining or for a landfill, and there are no unique or unusual land forms on the site. Accordingly, while the proposed action will result in a physical change to the land, such changes involving the removal of vacant structures and impervious surfaces and creation of green space will generally be beneficial. Thus, the proposed action will not have any significant adverse impacts on land.

## Impact on Water
*There is potential for erosion during demolition and site grading.*

The proposed action has the potential to alter drainage flow or patterns. By decreasing the amount of impervious surfaces in the area, it is anticipated that the proposed action will have a beneficial impact on stormwater flow quantities and surface water runoff. Due to the amount of developed land (buildings and pavement) currently located on the site, large quantities of stormwater currently flow off the property. The proposed action will increase the amount of pervious surfaces, increasing the amount of stormwater that will be able to infiltrate into the ground. This will retain stormwater on the site, helping to reduce the amount of surface runoff generated from the project area. This, in turn, will help improve stormwater handling in the area which currently relies on a combined storm/sewer system which periodically results in combined sewer overflows during heavy periods of rain. (In fact, the Buffalo Sewer Authority was recently issued an Order by the U.S. Environmental Protection Agency to address this issue).

The greatest risk of potential impacts to water will occur during the demolition of the existing structures on the site, when there will be a risk of erosion from exposed soils. The Authority will implement proper protocols during the demolition period to minimize potential impacts, and will voluntarily comply with the applicable provisions of the City of Buffalo's demolition ordinances. These provisions require

- Temporary construction fencing around the entire project limits to keep the public out of harm's way
- Proper handling of asbestos
- Baiting of all buildings for rodents
- Appropriate shutting off and capping of all utilities
- Measures, including constant wetting of materials during the demolition process to minimize dust and airborne particulates

- Standards for removal of debris and rubbish (to appropriate landfill facilities)
- Restoration of any damage to sidewalks, curbs or streets
- Standards for fill materials
- Appropriate grading and leveling
- Time limits for removal of all demolition debris
- Requirements for signage

A copy of the City of Buffalo's ordinance Section 103-38 "General Method of Demolition" is included in Appendix B. The Authority will require any demolition contractors to comply, on a voluntary basis, with these requirements.

Although the project's area of physical disturbance will be greater than 1-acre, coverage under the State Pollutant Discharge Elimination System (SPDES) General Permit for Stormwater Discharges from Construction Activity (GP-0-10-001) is not required because there is no direct discharge of stormwater to surface waters of the State. Stormwater runoff from the site is collected and conveyed through the combined sewer on Busti Avenue and ultimately treated at the City's wastewater treatment plant prior to discharge to the Niagara River. Although not required, the Authority's engineers have prepared a basic Storm Water Pollution Prevention Plan (SWPPP) for the demolition and restoration that includes erosion and sediment controls. This document and the associated project plans will establish best management practices to control erosion and minimize the amount of sediment entering the City's sewer system. These measures include, but are not limited to, installing stabilized construction entrances to remove material from vehicle tires before leaving the site; installing silt fence along the down-gradient site perimeter; protecting existing drainage inlets; and using sediment trapping devices in conjunction with potential excavation dewatering activities. The Erosion and Sedimentation Control Plan for Stormwater Pollution Prevention (SWPPP) is included in Appendix B.

In summary, the proposed action will remove impervious surfaces from the site and result in improved stormwater infiltration and control over the long-term. Over the short-term, demolition activities will voluntarily adhere to City ordinances and best practices protocols will be implemented to minimize impacts from stormwater runoff during demolition. In particular, a sediment and erosion control document has been developed to establish protocols to minimize erosion and the amount of sediment entering the City's sewer system during demolition and restoration activities. Accordingly, the proposed action will not have a significant adverse impact on waters.

**Impact on Air**

> *Proposed action has the potential to temporarily affect air quality due to dust created during the demolition process.*

Any project involving demolition has the potential to affect air quality on a short-term and temporary basis due to the release of dust associated with demolition activities. As noted above in the section on potential Impacts on Water, the Authority will require demolition contractors to minimize potential impacts by complying, on a voluntary basis, with the applicable provisions of the City of Buffalo's demolition ordinance. Specific to the issue of air quality, the demolition contractor will be required to wet all materials during demolition to minimize dust and airborne materials. Once demolition and site grading work is complete, disturbed areas will be reseeded expeditiously to prevent fugitive dust emissions from exposed soils. Accordingly, the proposed action will not have a significant adverse impact on air quality. (NOTE: See impact on public health for issues relating to asbestos in the buildings.)

**Impact on Plants and Animals**

> *Proposed Action is within an area where endangered plants or animals have been identified in the past.*

According to the NYSDEC Environmental Resources Mapper, an endangered plant and an endangered beetle were identified on or near the site in the past. The identified plants and animals are listed as follows:
- Golden Dock (Rumex fueginus): Last documented in 1898 (endangered).
- American Burying Beetle (Nicrophorus americanus): No date (endangered).

The statewide database used in the New York State Department of Environmental Conservation ("NYSDEC") Environmental Resources Mapper shows general areas where endangered species have been identified at some point in the past. It does not indicate whether these species are currently on a specific site. As the above information indicates, there have been no sightings of these species in over one hundred years. Over that time frame, the properties within the project area have been heavily disturbed by development and intensively used as residential properties with lawns and landscaped gardens. The project area no longer supports a unique habitat type. Given the amount of prior disturbance, it is unrealistic to expect that any threatened or endangered species would be present at the site.

While research conducted as part of prior studies associated with the Peace Bridge Expansion Project indicated that golden dock was recorded within the City of Buffalo, the Environmental Impact Statement ("EIS") for the Peace Bridge Expansion project demonstrates the Golden Dock would not naturally occur in the project area. Specifically, the Final EIS states:

> NYSDEC has indicated that the upper Niagara River is a waterfowl concentration area and has reported that one endangered plant species, golden dock (Rumex maritimus var. fueginus), has been recorded within the City of Buffalo (Ketchum 2003). Further consultation with the New York Natural Heritage Program botanist revealed that golden dock is a saline species that would not occur within the Project Area (Young 2004).

The Final EIS also indicates that no federally listed or proposed threatened or endangered species were within the Project Area, according to the United States Fish and Wildlife Service. While a number of waterfowl were identified as frequenting the wider Project Area for the Peace Bridge expansion, these species would be found closer to the Niagara River. As noted above, there is no remaining habitat value to the properties on Busti Avenue. Accordingly, there will be no significant adverse impacts to endangered or threatened plants or animals. Appendix C provides supporting information regarding impacts to endangered or threatened species.

## Impact on Aesthetic Resources

*The proposed action will result in the removal of existing structures, which will affect views in the vicinity.*

The proposed action will change the visual character of Busti Avenue. However, it is expected that the aesthetic impacts will be beneficial. With some limited exceptions, the remaining houses to be demolished on Busti Avenue are generally in poor condition with no significant level of improvements having been made in almost 20 years. (Some of the structures, including the Wilkeson House, were already in severely deteriorated condition when they were acquired by the Authority in the 1990's.) Photographs showing current conditions on the block are included in Appendix D and speak for themselves. Structural integrity reports document visible deterioration and deficiencies of the structural support systems for these properties. A 2009 Structural Condition Inspection and Site Analysis report is included in Appendix E. Three of the buildings (757, 771 and 793 Busti Avenue) were identified as severely deteriorated with demolition recommended. Three other structures (765, 777 and 791 Busti Avenue) were in "stable" condition, although some

level of deterioration is noted with each of these buildings. Only one of the buildings, 783 Busti Avenue, was found to be in satisfactory condition. 775 Busti, which the Authority is working to purchase, also appears to be in stable condition. The structural integrity of 775 Busti Avenue was not assessed, because that building is privately owned, although the Authority is currently negotiating the purchase of this property.

In their current condition, the unoccupied buildings have been a blighting influence on the neighborhood. While it is acknowledged that the condition of these properties is the result, at least in part, of a lack of investment in the properties over a period of decades, it is noted that several of the structures, particularly 771 Busti, were in an advanced state of deterioration when acquired by the Authority; that these properties were purchased by the Authority with the intent of removing the structures and that regardless of underlying causes, based on the current condition of these properties, demolition is necessary to protect public health and safety and improve the general welfare of the community. Simply put, the condition and appearance of these properties have been issues of concern to the neighborhood for many years and these structures have not been used as residential structures in many years. Moreover, demolition will help create additional buffering between residential homes in the neighborhood and the Plaza, and improve the appearance of the surrounding neighborhood. While the building at 775 Busti Avenue is not a blighting influence, it would become the only structure remaining on the block. Thus, removing this building will result in contiguous open green space on the entire Busti block between Rhode Island and Vermont Streets.

A landscape plan has been prepared to ensure that the proposed action will result in a visual asset to the neighborhood. Photographs of existing conditions and photo-simulations of the proposed changes are provided in Appendix D, along with the landscape plan for the site.

In contrast to the blighting influence of the majority of the existing structures, the proposed landscape plan will result in improved views of green space from the neighboring properties and the Plaza. The photo-simulations depict what the new views of the property would be with the landscape plan implemented. Approximately thirty new trees, a mix of shade and ornamental, will be planted to supplement existing trees. The site will graded and seeded with grass. Photo-simulations are in Appendix D. Overall, the proposed action will result in beneficial impacts to aesthetic resources replacing mostly vacant, boarded up houses with green space.

### Impact on Historic and Archeological Resources

*Impact: The proposed action will result in the demolition of three structures that were previously identified as eligible for listing on the National Register, one of which is also a locally designated landmark.*

The Authority acquired seven of the eight buildings that would be demolished under the proposed action over several years between 1995 and 1998. The intent of these purchases was to remove the structures in order to establish additional buffering between the Authority's operations at the U.S. Customs Plaza and residential properties in the adjacent neighborhood. At the same time, the Authority was planning an expansion to increase capacity, and the properties along Busti were contemplated as area for Plaza expansion.

From an archeological perspective, the area around the Plaza was identified as sensitive in conjunction with a Phase 1A investigation prepared for the capacity expansion project. In this case, however, the scope of activity associated with the demolition of the structures is largely limited to above-ground activity. The only below grade activities involve removal of the foundations to below grade which areas have been previously disturbed when the basements were installed.

Three of the properties scheduled for demolition were identified as potentially National Register eligible during environmental and Section 106 reviews conducted as part of the former Peace Bridge Plaza Expansion project. These three properties are 771, 777 and 793 Busti Avenue. None of the properties fall within the National Register eligible Prospect Hill Historic District and all are sufficiently distant from this resource and Front Park such that demolition will not adversely affect these historic resources. (See attached project location maps). Further past investigation by the Department of Anthropology at SUNY Buffalo and a recent study conducted in conjunction with this environmental review found that there had been significant alterations to the buildings over the years by past owners, rendering these properties no longer National Register eligible. The architectural/ historical assessment of the buildings concludes that the properties have been significantly altered and no longer retain sufficient integrity to be a unique or outstanding architectural resource. In addition to the alterations to the buildings' original character, there are major structural problems with 771 and 793 Busti Avenue. At 793 Busti, there has been severe water damage. Several areas of the ceiling throughout the back portion of the house, including approximately half of the kitchen, have completely fallen down. Floor boards have buckled and a bearing wall or column that supported the center support beam was removed by prior owners. As a result, the structural integrity of the building is compromised and a 2009 structural report recommended that it be

demolished. All three floors are now sagging toward the center bearing wall. Similarly, 777 Busti has suffered water leakage into the basement through the basement bulkhead door, deteriorated clapboards and sill plates, chimney damage and areas where the roofing is rotting.

The property at 771 Busti, also known as the "Wilkeson House" has been designated a local landmark by the Buffalo Preservation Board. This property also has had significant alterations. A study by Archeological Survey, in consultation with SHPO, determined that the property did not retain sufficient integrity to meet the National Register eligibility requirements under Criterion C (distinctive characteristics). Initially built as a one-family home, the house had been converted to three units by 1908, as documented in the City Directory of that year. The conversion gutted the interior in order to subdivide the space, and few of the original interior architectural features remain. An Architectural Integrity Assessment prepared in 1996 noted that the exterior had also undergone significant alterations and visible remodeling. Windows were replaced or bricked up, porches were removed, and exterior brick had been replaced and/or painted over. The Architectural Integrity Summary concluded that "[t]he demolition of the structure at 771 Busti Avenue would not significantly detract from the body of architecture throughout the City that preserves this element of style."

The Wilkeson house remains potentially National Register eligible under Criterion B (association with the lives of significant persons) due to its historical connections to Colonel Samuel H. Wilkeson. Wilkeson was a Civil War Veteran and a grandson of Mayor Samuel Wilkeson, one of the early mayors of the City. The house was built by James Storms in ca. 1864. Wilkeson purchased the property in 1883 and moved into the residence around 1886. He lived there until his wife's death in 1903, when he moved to Niagara Square and rented the property to tenants. The integrity of setting, feeling and association of the residence and context in which Wilkeson lived has been significantly compromised by changes to the residence and the historic viewshed.

Despite its history, there are severe structural problems with the Wilkeson House, to the extent that it is not safe to enter. The property had been vacant and abandoned for more than 8 years when the Authority acquired it in 1995. An appraisal prepared in 1994, before it was acquired by the Authority, noted that the structure was in

> 'poor overall condition and not habitable. The hardwood floors have
> buckled in many places and can be felt under the carpeting. Plumbing
> fixtures are not operative and show signs of removal being undertaken.'
> (from Real Estate Appraisal, 1994)

The 1996 Architectural Integrity Summary, conducted when the Authority took possession of the building, noted severe structural problems. Its author observed that at the site visit "rain was pouring in from not only the roof, but from holes in the exterior walls and exterior staircases. The flooring gave way in several locations on the third floor and many of the walls are collapsing, with the lathe and plaster missing in many places." A 1996 structural analysis determined that all four chimneys and the roofs over the main building, the east wing and the east addition had leaked for years, allowing water infiltration and causing severe structural deterioration. Key structural deficiencies that were identified include rotting rafters, rotting floor joists and main beams and joists with no bearing supports. The north brick wall was observed to have shifted away from the main building by about 1.5 inches. The building is so structurally compromised that current plans are to treat the entire building as potentially hazardous waste because it is not possible to safely enter the structure to remove asbestos and other hazardous materials prior to demolition.

The Authority commissioned a report to investigate the reuse potential of the building in 1997 at the request of the NYS Historic Preservation Office. At that time, the Authority was considering converting and expanding space for use as offices. The reuse report concluded that such an action was impractical. The only salvageable portion of the house was the exterior perimeter walls. Extensive interior and exterior repairs were necessary and little of the historic material would remain. Too much investment was required to address structure deficiencies, and the space would not meet programming needs. A more recent structural assessment conducted in 2009 concluded the building was unsafe and recommended demolition. (The 2009 structural assessment was made available to the public on the Authority's website).

The Authority has implemented several mitigations to address the impacts to architectural and historic resources. The homes were offered for free to any interested group or individual who was able to relocate them to another site. The Authority publicized this offer extensively, including postings on its website, direct mailings to the City of Buffalo, neighborhood and preservation stakeholder groups and at a public information meeting held on April 4, 2012 at the Porter Avenue Public Library. Several individuals did contact the Authority for additional information, but no one stepped forward to relocate the structures.

The Authority is requiring demolition contractors to consider the use of "deconstruction" techniques during demolition. Deconstruction entails going through the property and removing materials eligible for salvage (e.g. lumber, architectural features, cabinets,

windows, woodwork, etc.) prior to demolition. This approach preserves items of architectural merit, enables their use in other properties and reduces the amount of waste that ends up in landfills. The Authority has required potential demolition contractors to consider and include a component for materials re-use, salvage and recycling in their bid proposals. These reuse plans will be a factor considered when selecting a demolition contractor. To limit the amount of solid waste generated, contractors will also be encouraged to recycle other materials where feasible.

While it is not feasible to preserve the structures, information about the three National Register eligible buildings (771, 777 and 793 Busti Avenue) will be preserved. The Authority has initiated a formal documentation effort to provide a lasting record of their significance. The historical archiving will comply with the standards of the Heritage Documentation Programs (HDP), part of the National Park Service. HDP establishes the standards for historic property documentation, currently recognized as the Secretary of the Interior's Standards and Guidelines for Architectural and Engineering Documentation. These standards are used by Historic American Building Survey (HABS) and Historic American Engineering Record (HAER). In accordance with the Secretary's Standards, the documentation will capture the significance of the structure; be accurate and verifiable; and clear and concise. The materials will be prepared in a manner that has archival stability.

With input from SHPO, a qualified professional has prepared a Level II HABS/HAER package for 771, 777 and 793 Busti. Level II documentation includes collection of existing drawings, photographs with large-format negatives of the interior and exterior of the buildings, and a narrative history and description. Description of the historical information and physical aspects of the building will document the physical history and context of the building, including alterations. The documentation will also include a full description of the condition and features of the building. In evaluating historic buildings, a number of factors are looked at to gain a complete understanding of the building's history. These factors include the moldings and finish materials (e.g. wall paper or paint), type of hardware and nails used; construction techniques; material variance (to understand remodeling history); changes in building plan, fenestration (windows) and massing. Other sources of information include historic maps, census data, titles, city directories, period publications, historic photographs and oral histories. This information is presented as a written narrative that describes the property's physical appearance and the property's history. The narrative will be printed as an archive.

This approach has been reviewed by SHPO, which found, in a letter included in Appendix A, that the mitigation measures that PBA has proposed are appropriate and consistent with

SHPO standards. By that letter, SHPO also concurred with the Authority's position that it is not subject to SHPO regulations because it is not a State agency. The letter also acknowledged that the materials submitted "indicate[d] that the buildings have reached the end of their structural life and that rehabilitation or adaptive reuse by the [Authority] would be economically and programmatically unreasonable."

Despite the condition of the structures at 771, 777 and 793 Busti which, according to experts, renders the historical integrity of these properties questionable, demolition of these structures has the potential to have an adverse impact to historic resources. However, based on the extensive mitigation measures implemented by the Authority including archival documentation, the loss of these structures will not constitute a significant adverse impact. In addition, the demolition of the vacant and boarded up residential structures to be replaced with landscaped green space are of sufficient distance, and will improve area aesthetics, such that this action will not have an adverse impact on historic resources in the vicinity of the site such as the Prospect Hill Historic District and the National Register listed Front Park. Documentation related to historic resources is contained in Appendix E.

## Noise and Odor Impact

*There may be temporary noise impacts during demolition activities.*

It is anticipated that during the period when the buildings are being demolished, the proposed action may temporarily generate noise that exceeds background levels. The intermittent noise associated with construction vehicles and equipment will be short-term and temporary in nature. Demolition activities, which are estimated to last no more than two months, will be limited to daylight working hours, when noise sensitivity is typically lowest, particularly in this developed area. Construction activities will comply, on a voluntary basis, with applicable noise ordinances and laws. Accordingly, noise impacts will be limited, temporary and short-term, and will not have a significant adverse impact upon the environment.

## Impact on Public Health

*The properties to be demolished contain asbestos, which, if handled improperly, could potentially affect public health.*

The proposed action has the potential to result in impacts to public health, due to the presence of asbestos within the structures to be demolished. The Authority will comply with all applicable laws and will implement proper protocols during the demolition period

to minimize potential impacts from demolition activities, including impacts to public health. Asbestos abatement will be performed in accordance with US EPA, NYSDEC, NYS Department of Labor and City of Buffalo requirements. With the exception of 771 Busti, as discussed below, all asbestos and other potentially hazardous waste, such as mercury thermostats, fluorescent lights or miscellaneous cleaners, will be removed from the structures prior to demolition, properly packaged and disposed of in accordance with applicable laws. Demolition contractors will employ wet methods and other engineering controls during abatement to minimize airborne asbestos concentrations. An on-site Project Monitor will conduct air sampling throughout the abatement period to measure levels of airborne contaminants including asbestos.

Due to significant structural deficiencies, it is not safe for demolition contractors to enter the structure at 771 Busti Avenue. As a result, removal of any hazardous waste or contaminated materials from that building cannot occur prior to demolition. As such, the entire structure at 771 Busti will be treated as an asbestos abatement project in order to protect the health and safety of the construction workers. Because hazardous materials cannot safely be removed and treated separately, all materials from this address will be treated as hazardous or potentially contaminated. During demolition, the structure and debris will be wetted on a continual basis to prevent airborne emissions. Air sampling will be performed throughout the demolition process to monitor airborne fiber levels. All of the debris from this structure will be disposed of as if it were asbestos waste.

There will be full-time oversight of demolition activities by a NYS certified Project Monitor during asbestos abatement. In addition, the Project Monitor will perform all of the required air sampling during abatement. In addition to ensuring proper handling of asbestos and other hazardous materials, the Authority will protect public health during demolition by complying, on a voluntary basis, with all applicable requirements of the City of Buffalo Demolition Ordinance. Such compliance entails a number of measures designed to protect public health (discussed in more detail in analysis of impacts to water, above).

It is also important to note that the demolition of the structures, particularly the more severely deteriorated vacant structures, will have a beneficial impact on public health and safety and the general welfare of the community. These properties represent a safety and security threat to the neighborhood. These properties have been regularly broken into, targeted for vandalism and, occasionally, more serious criminal activity. In addition, neighborhood children frequently play on the existing green space on the south side of the block in close proximity to these structures. In their current condition, these properties represent a danger to the neighborhood and anyone who might enter them. Thus, based on

the current condition of these properties, demolition is necessary to protect and improve public health and safety and improve the general welfare of the community.

In summary, through compliance with applicable laws to remove, handle and dispose of asbestos and other hazardous materials and implementation of appropriate protocols, the proposed action will not have a significant adverse impact on public health. The pre-demolition surveys for asbestos containing materials for 757, 765, 771, 783, 791 and 793 Busti Avenue are included in Appendix F. Similar documentation will be provided for 775 Busti Avenue in the event the PBA successfully acquires this property.

## Impact on Growth and Character of Community or Neighborhood

*There will be a reduction in the density of land use and the addition of new open space in the area.*

The proposed action has the potential to affect the character of the immediate neighborhood. The remaining portion of residential structures on the half block between Rhode Island and Vermont will be fully transitioned to a landscaped grassy area. In general, it is anticipated that these changes will be beneficial. The removal of the largely vacant boarded-up structures will remove their blighting influence and increase the amount of buffer between occupied residential homes on Columbus Parkway Street and operations at the Plaza. It will also create additional greenspace and recreational opportunities for neighborhood children (similar to the half block of Busti which has already been converted to greenspace).

The action is also consistent with City planning documents, including the City's Comprehensive Plan (*Queen City in the 21st Century*) and the City's Waterfront Corridor Initiative. In 2003 and 2004, the City of Buffalo undertook a Comprehensive Planning effort for its waterfront corridors. A specific plan (the Neighborhood and Plaza Improvement Plan) was developed for the area around the plaza designed to establish a greener, safer and more attractive interim use for the area. The plan called for the demolition of all the structures along the block of Busti Avenue between Rhode Island and Vermont Streets, and development of landscaped green space in their place. In 2004, the City of Buffalo and the Public Bridge Authority signed a Memorandum of Agreement (MOA) formalizing this interim plan for the Peace Bridge area, known as the Peace Bridge Gateway Improvement Project. The current proposed action implements the MOA. As the interim plan notes, the demolition of these structures "allows for the development of an effective landscaped separation between the neighborhood and the plaza in the area of the most intensive bridge operations." The stated intent of the Plan was to place the

plaza in a park-like setting and to implement the community's vision for "a great neighborhood and a grand gateway". The MOA was officially signed by the City of Buffalo in 2004. While the Authority undertook millions of dollars in work under the plan, the City did not implement demolition of the structures. Appendix G includes the referenced planning documents, including the Neighborhood and Plaza Improvement Plan, as well as the MOA. The City's zoning code also recognizes the unique position of this area as a "gateway" to the City, and the proposed action is consistent with that vision.

In Summary, the proposed action will change the character of the neighborhood by removing residential structures and replacing these structures with green space. However, the proposed changes are consistent with local land use plans for the area and will be an aesthetic and recreational improvement for the community. Thus, overall, the proposed action will not have a significant adverse impact on community character.

## Public Controversy

*There is likely to be public controversy related to potential adverse environmental impacts.*

There have been significant levels of controversy associated with prior Authority projects. In particular, plans to expand Peace Bridge capacity have generated considerable controversy. Thus, although the proposed action is independent of any potential future plaza expansion, and is necessary in any event, it is reasonable to assume that the proposed action will generate additional public controversy (and possibly litigation). Although the Authority is not subject to State or local laws on matters involving its internal operations, it has, on a voluntary basis, complied with the NYS Environmental Quality Review Act (SEQR). This voluntary compliance is intended to create a process for public review and input and to help mitigate any adverse impacts to the greatest extent practicable. The Authority has also implemented a public outreach plan to ensure that information about the proposed action would be readily available to the public and stakeholders and that interested parties would have an opportunity to provide input. Actions taken by the Authority pursuant to the SEQR process/public outreach plan include the following:

February 27, 2012:    Posting of information about the proposed action on the Authority website and mailings to key stakeholders;

March 21, 2012:    Issuance of Public Notice of Public Information Session about the proposed action to be held on April 4, 2012;

| April 4, 2012: | Public Information Meeting at the Porter Avenue Niagara Branch Library from 2:00pm to 7:00pm; |
|---|---|
| April 11, 2012: | Letters to Potentially Interested Agencies soliciting feedback on the proposed action. |

The public information session, held on April 4, 2012, provided interested neighbors and community residents the opportunity to learn more about the plans for the proposed action. Notice of the public information session was posted on the Authority's website and covered by local news agencies. Attendees were provided ample opportunity to provide their comments and voice their concerns.

Comments received at the public information session were wide ranging. One commenter expressed satisfaction that after ten years the structures were finally going to be demolished. Another commenter simply expressed the opinion that the Authority should save the Wilkeson House. Others comments were related to health concerns from the Plaza operations (which are not relevant to this action) and to the appearance of the Plaza as an entrance to Buffalo. While demolition of the structures does not involve the Plaza and is not directly related to any future plans for any improvements to the Plaza, the additional green space should improve the visual appeal of the Plaza area somewhat.

On April 25, 2012, the Authority received an email from a neighborhood resident expressing the view that the public meeting on April 4th was "absurd and ridiculous" because no plans for any expansion of the existing Plaza had been made available. Of course, as discussed during the public information session, there are many potential hurdles which must be overcome in order to achieve any Plaza expansion and the Authority is pursuing demolition of the Busti Avenue structures independent of any possible Plaza expansion plans. Thus, the houses need to be demolished, and attendant community benefits will be realized, whether or not any expansion of the Plaza ever occurs.

Additional comments and input have been provided by SHPO and the City of Buffalo Preservation Board ("Preservation Board"). SHPO's comments, which were provided on an advisory basis, indicated that, while the proposed action would constitute an adverse impact to historical resources under its regulations, the Authority's plan to mitigate such impacts was appropriate and met SHPO standards. SHPO also acknowledged the deteriorated condition of the structures, but noted that it would be remiss if it did not state that, in many ways, this was a self imposed hardship caused by the Authority's lack of investment in the properties. SHPO expressed particular sadness at the loss of 771 Busti. While these sentiments are acknowledged, it is noted that several of the structures,

particularly 771 Busti, were already in an advanced state of deterioration when acquired by the Authority; that these properties were purchased by the Authority with the intent of removing the structures; and that regardless of underlying causes, based on the current condition of these properties, demolition is necessary to protect public health and safety and improve the general welfare of the community.

In response to the Authority's letter to potentially interested agencies soliciting input on the proposed Demolitions, the Preservation Board sent the Authority a letter instructing the Authority to file its plans for demolition with the Preservation Board for review pursuant to Chapter 337 of the City Code. The Authority responded in writing by confirming for the Preservation Board that, as an international compact entity, the Authority is not generally subject to local land use controls such as Chapter 337 but encouraged the Preservation Board to provide the Authority with specific comments or concerns regarding the Demolitions.

In summary, the Authority has provided the public and potentially interested agencies with a meaningful opportunity to provide input and/or voice concerns regarding the proposed action. Documentation related to the Authority's outreach is included in Appendix G. SEQR related correspondence with potentially interested agencies is included in Appendix A.

Doc # 06-72295.1

**ATTACHMENTS:**
- Project location maps
- Environmental Features Map (no floodplains, no wetlands.)

**APPENDICES:**

Appendix A: SEQR Related Correspondence

Appendix B: Documentation of Impact to Land and Water:
- City of Buffalo Demolition Protocols
- Sediment and Erosion Control Plan (SWPPP)

Appendix C: Documentation of Impact to Threatened or Endangered Species
- Map from New York State Department of Environmental Conservation "Environmental Resources Mapper"
- Identified species per the Environmental Resources Mapper
- Excerpt from Final Environmental Impact Statement, Plaza Expansion Project (A copy of the complete Final Environmental Impact Statement is maintained at the Authority offices.)

Appendix D: Documentation of Impact on Aesthetic Resources
- Photographs of Existing Conditions
- Photo-simulations (before/ after)
- Landscape Plan
- Planting Plan

Appendix E: Documentation of Impact on Historic and Archeological Resources
- Structural Condition Inspection and Site Analysis of 757, 765, 771, 777, 783, 791 and 793 Busti Avenue, Buffalo, New York, CHA, March 2009
- Reuse Feasibility Study: Conclusion (A copy of the complete report is maintained at the Authority offices)
- Architectural Integrity Summary (A copy of the complete report is maintained at the Authority offices)Phase 1A report: Table of Contents (A copy of the complete report is maintained at the Authority offices)
- Level II HABS/HAER documentation for 771 Busti Avenue
- Level II HABS/HAER documentation for 777 Busti Avenue
- Level II HABS/HAER documentation for 793 Busti Avenue

- Application for Landmark/ Landmark Site (Submitted to Buffalo Preservation Board)
- Correspondence from NYS Division for Historic Preservation dated May 17, 2012.
- Correspondence to NYS Division of Historic Preservation dated May 18, 2012.

Appendix F: Impact on Public Health and Safety
- Asbestos Abatement Process Summary
- Pre-Demolition Surveys:  757, 765, 771, 783, 791 and 793 Busti Avenue

Appendix G: Impact on Growth and Character of Community or Neighborhood
- Memorandum of Agreement: Neighborhood and Plaza Improvement Plan ("Peace Bridge Gateway Improvement")

Appendix H: Public Outreach Materials
- Notice of Availability for Relocation (February 27, 2012)
- Official Public Notice (March 12, 2012)
- Copies of Public Info Session Boards (April 4, 2012)
- Sign-in Sheets: Public Information Session
- Comments Received: Public Information Session
- Comment email from neighbor (April 25, 2012)

Doc # 06-72295.1



**PEACE BRIDGE DEMOLITION & RESTORATION
OF PROPERTIES ON BUSTI AVE**

Buffalo, New York

**Project Location Map**

wendel

WO Project # 22/0012
Map Created: March 28, 2012

Wendel Duchscherer Architects & Engineers, P.C. shall assume no liability for 1. Any errors, omissions, or inaccuracies in the information provided regardless of how caused or; 2. Any decision or action taken or not taken by the reader in reliance upon any information or data furnished hereunder. Data Sources: NYS GIS Clearinghouse, ESRI Basemap



PEACE BRIDGE DEMOLITION
& RESTORATION
OF PROPERTIES ON BUSTI AVE
Buffalo, New York
Project Area

LEGEND

Project Site

Parcel Boundary

0  25  50      100
▭▭▭▭▭▭▭▭ Feet

**wendel**

WD Project # 330912
Map Created: May 22, 2012

Wendel Duchscherer Architects & Engineers, P.C. shall assume no liability for 1. Any errors, omissions, or inaccuracies in the information provided regardless of how caused or, 2. Any decision or action taken or not taken by the reader in reliance upon any information or data furnished hereunder.  Data Sources: NYS GIS Clearinghouse, ESRI Basemap



# Erie County On-Line Mapping System



Erie County and its officials and employees assume no responsibility or legal liability for the accuracy, completeness, reliability, timeliness, or usefulness of any information provided. Tax parcel data was prepared for tax purposes only and is not to be reproduced or used for surveying or conveyancing.

| 0 | 0.02 | 0.0 Miles |

0.0

**Legend**

- Railroads

**Streets and Highways**
- —— Interstate
- —— Primary State Road
- —— Secondary State Road
- —— County Road
- —— Local Road

Parcels

Streams

**DEC Wetlands**

**National Wetlands Inventory**
- Wetlands
- No Digital Data

**FEMA Floodplains**

**1ft Color Orthos**
- Red   Band_1
- Green   Band_2
- Blue   Band_3

**2ft Color Orthos**
- Red   Band_1
- Green   Band_2
- Blue   Band_3

1 : 1,269

**Notes**

Enter Map Description

**ERIE COUNTY, NEW YORK**
**DEPARTMENT OF ENVIRONMENT & PLANNING**
**OFFICE OF GEOGRAPHIC INFORMATION SERVICES**