UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE CAMPAIGN FOR BUFFALO HISTORY,                    **DECISION AND ORDER**
ARCHITECTURE AND CULTURE, INC.,

                    Petitioner,      12-CV-00605(M)

v.

BUFFALO AND FORT ERIE
PUBLIC BRIDGE AUTHORITY,

                    Respondent.
_____

      Before me is the motion of petitioner The Campaign for Buffalo History,

Architecture and Culture, Inc. ("Campaign") for a preliminary injunction restraining respondent

Buffalo and Fort Erie Public Bridge Authority ("PBA") from demolishing several vacant

residential properties located on Busti Avenue in the City of Buffalo [40].[1]  For the following

reasons, the motion is denied.


## PROCEDURAL BACKGROUND

      On June 19, 2012 the Campaign commenced this proceeding in State of New

York Supreme Court, County of Erie by filing a Petition [1-2] pursuant to New York Civil

Practice Law & Rules ("CPLR") Article 78, seeking to prevent the PBA "from proceeding with

activities intending to culminate in the demolition of properties situate at 757, 765, 771, 775,

783, 791 & 793 Busti Avenue in the City of Buffalo, New York . . . and to assure that the historic

---

[1]     Bracketed references are to CM-ECF docket entries. Based upon the parties' consent
pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. ("Rule") 73 [43], District Judge William M. Skretny
has referred the case to me to conduct all proceedings [45].

buildings that make up the Busti Avenue Structures are properly preserved". Petition, ¶1. That same day, the Campaign obtained a Temporary Restraining Order ("TRO") from New York State Supreme Court Justice Joseph R. Glownia, prohibiting the PBA "from performing any further activity toward the demolition or destruction of structures situate at 757, 765, 771, 777, 783, 791 & 793 Busti Avenue . . . until further order of this Court" [1-2]. On June 27, 2012 the PBA removed the proceeding to this court [1]. On July 10, 2012, the Campaign moved to remand the proceeding to state court [10]. I denied that motion on October 5, 2012 [47].

Although the parties dispute "whether, by operation of statute or common law, the TRO has expired", in exchange for the Campaign's cooperation in formulating a Case Management Plan, the PBA agreed "to treat the TRO as continuing in force and covering an additional structure located at 775 Busti Avenue, pending a decision by this Court whether to issue a preliminary injunction pending a final decision on the merits". Proposed Case Management Plan [17], ¶4. In accordance with the schedule agreed to by the parties, the Campaign moved for a preliminary injunction on September 7, 2012 [40], and oral argument was held on December 17, 2012 [57].


## FACTUAL BACKGROUND

The PBA "is the product of a compact between New York and Canada, approved by Congress". Mitzkovski v. Buffalo and Fort Erie Public Bridge Authority, 435 F.3d 127, 135 (2d Cir. 2006) ("Mitzkovski I"). It owns and operates the Peace Bridge crossing the Niagara River between Buffalo, New York and Fort Erie, Ontario, Canada, as well as the plazas at both ends of the Bridge. Id. at 129; Reinas Affidavit [19-1], ¶3.

The PBA acquired the Busti Avenue properties in the 1990s, "with the intent of demolishing the structures to establish additional buffering between the U.S. plaza and the adjacent neighborhood and for possible future expansion".  Affidavit of PBA's General Manager Ron Rienas [19-1], ¶18.[2] They were "boarded up and held for future demolition".  Rienas Affidavit [39-2], ¶3. Over the years, several residents in the area, including Campaign members Elizabeth Martina and Peter Certo, have complained about the dilapidated condition of the properties and their negative impact on the neighborhood, noting that "[t]he properties are a breeding ground for rats and feral cats . . .  Illicit drugs are bought and sold behind the homes.  Prostitutes frequent the property . . . . Used needles, condoms and other paraphernalia are discarded behind the houses.  Cars drive illegally behind the houses at a high rate of speed which has endangered our property and our safety . . . . Our garages, storage sheds and cars are frequently broken into.  Private property is constantly stolen." Id., ¶¶4-6 and Ex. A.

In order to address these problems, the PBA hired off-duty police officers as a security force to patrol the properties.  Affidavit of PBA's Director of Security, Thomas J. McCarthy [39-4], ¶6.  "The Authority's efforts to keep these buildings secure is not just a matter of keeping vandals from damaging the buildings and keeping criminal elements from using [them] for illegal activity.  It is also important to keep people out of these buildings as a matter of public safety because some of the buildings have been in bad shape for some time and it would be dangerous for anyone to enter." Id., ¶17.

In late 2008 the PBA received complaints from the City of Buffalo regarding the condition of the Busti Avenue properties. The PBA consulted with the Federal Highway

[2]        The last parcel, located at 775 Busti Avenue, was acquired in June 2012. Id.

-3-

Administration regarding the possible demolition of the properties, but was instructed not to proceed with the demolition until that body completed its review of a proposed "Capacity Expansion Project" (calling for the possible construction of a second bridge, widening or replacing the existing bridge, or reconfiguration or reconstruction of the U.S. and Canadian plazas). Rienas Affidavit [19-1], ¶¶9, 14.

In January 2012, the Federal Highway Administration terminated the Capacity Expansion Project due to cost and environmental concerns. Id., ¶15. Shortly thereafter, the PBA began planning for the demolition of the Busti Avenue properties. Id., ¶16. On February 27, 2012 the PBA wrote to the Campaign's Executive Director, Timothy Tielman, advising him that it was commencing the demolition process and offering the properties to the Campaign "free of charge subject to paying all relocation costs". [4], p. PBA000049.[3]

While maintaining that it is exempt from the requirements of the New York State Environmental Quality Review Act ("SEQRA" or "SEQR") (N.Y. Environmental Conservation Law ("ECL") §§8-0101 *et. seq.)*, the PBA "determined that it would undertake, on a voluntary basis, a detailed environmental review pursuant to SEQR for the Demolition Project". Rienas Affidavit [39-2], ¶7. In connection with that review, it retained "Wendel, an experienced SEQR consulting firm to provide advice on the scope and content of the PBA's environmental review; Watts Engineering to provide engineering analysis and support; and KTA Preservation Specialists to help evaluate the historic resources and develop and implement mitigation plans as appropriate". Id., ¶9.

---

[3]     Identical letters were sent to several other organizations. Id., pp. PBA000044-51.

On April 4, 2012 the PDA held a public information meeting concerning the proposed demolition project. Those attending the meeting were given the opportunity to provide comments and voice their concerns. Although Mr. Tielman attended the meeting, neither he nor any of the Campaign's other members submitted comments or voiced concerns about the proposed demolition. Rienas Affidavit [19-1], ¶20; Rienas Affidavit [39-2], ¶¶11-13.

The PBA's SEQR consultant, Wendel, prepared Part 1 of an Environmental Assessment Form ("EAF"),[4] which was completed on April 10, 2012. By letters dated April 11, 2012, the PBA circulated that form to a number of potentially interested local and state agencies, requesting comments about the proposed demolition and its environmental impacts by May 15, 2012. Rienas Affidavit [39-2], ¶9; [4], pp. PBA000090-107. The only interested agency to respond was the City of Buffalo Preservation Board, which asserted that the PBA was required to submit demolition plans to the Board for its review pursuant to Chapter 337 of the Charter and Code of the City of Buffalo. Rienas Affidavit [19-1], ¶22. While pointing out to the Preservation Board that, as an international compact entity, its demolition project was not subject to local laws, the PBA invited the Board to provide it with any specific comments or concerns regarding the demolition. It received no further comments in response to that invitation. Id., ¶23; [4], pp. PBA000418-19).

The PBA also sought input regarding the demolition from the New York State Office of Parks, Recreation & Historic Preservation ("SHPO"), particularly with regard to the

---

[4]        An EAF is "a form used by an agency to assist it in determining the environmental significance or non-significance of actions". 6 N.Y.C.R.R. §617.2(m).

properties located at 771, 777 and 793 Busti Avenue, which the SHPO had previously identified as eligible for listing as historic structures on the National Register. Id., ¶24. By letter dated April 12, 2012 ([4], pp. PBA000108 *et. seq.*), the PBA explained to the SHPO why the dilapidated condition of the properties warranted their demolition notwithstanding their historical significance. The SHPO replied by letter dated May 17, 2012, acknowledging that it was acting only "in an advisory capacity as the [PBA is] not subject to NYS law with regard to operational matters", and agreeing that "the buildings have reached the end of their structural life and that rehabilitation or adaptive use by the PBA would be economically and programmatically unreasonable. The documentation presents a picture of three buildings that are in a state of significant deterioration." Id., pp. PBA000414-15.[5]

In April and May 2012, Wendel completed the preparation of Parts 2 ([4], pp. PBA0000430-440) and 3 (id., pp. PBA000441, *et. seq.*) of the EAF. Rienas Affidavit [39-2], ¶14. Part 3 addressed in detail the potential impact of the proposed demolition on "Land . . . Water . . . Air . . . Plants and Animals . . . Aesthetic Resources . . . Historic and Archaeological Resources . . . Noise and Odor . . . Public Health. . . [and] "Growth and Character of Community or Neighborhood".

Following completion of the SEQR review process, on May 25, 2012 the PBA adopted a resolution setting forth findings of fact concerning its review of the demolition project, concluding that the project would not have a significant adverse impact on the environment ("Negative Declaration"), and approving the project. Rienas Affidavit [39-2], ¶14; [4], pp.

---

[5]    However, the SHPO further noted that "this is in many ways a self imposed hardship created by the PBA as a result of not providing the buildings with a minimum level reasonable maintenance". Id.

PBA000788-802.  Thereafter, the PBA contracted with a demolition contractor who fenced off the demolition site and began preparations for the demolition.  Rienas Affidavit [39-2], ¶¶15-16.

At that point, the Campaign commenced this proceeding and obtained the TRO from Justice Glownia.

## ANALYSIS

### A.    Does the Campaign Have Standing?

As a threshold issue, the PBA challenges the Campaign's standing to maintain this litigation, arguing that neither the campaign nor its members have alleged sufficiently concrete and particularized injury which might flow from the demolition project. PBA's Memorandum of Law [39], pp. 5-13. I disagree. The Verified Petition [1-2] alleges that the Campaign "is a membership organization dedicated to the preservation of historic, architectural and cultural resources in the city of Buffalo".  Id., ¶3.  It "has over 400 members who are keenly interested in the local history, architecture and culture ".  Id., ¶ 8.  Moreover, several of its members live in close proximity to the properties which are slated for demolition, "and their interests are directly affected by the [PBA's] proposed demolitions". Id., ¶11.

"'[I]njury" for standing purposes encompasses harm to aesthetic or cultural interests if the relevant statute was intended to protect such interests." Preservation Coalition of Erie County v. Federal Transit Administration, 129 F.Supp.2d 551, 561 (W.D.N.Y. 2000) (Skretny, J.).  Among the interests which SEQRA was intended to protect are "the character or quality of important historical . . . architectural or aesthetic resources or of existing community or neighborhood character".  6 N.Y.C.R.R. §617.(c)(1)(a).  Moreover, the fact that certain of the

PBA's members live in close proximity to the proposed demolition gives them (and therefore the PBA) an interest which is different from the public at large. *See* Matter of Sun-Brite Car Wash, Inc. v. Board of Zoning Appeals, 69 N.Y.2d 406, 413-14 (1987) ("proof that special damage or in fact injuries is not required in every instance to establish that the value or enjoyment of one's property is adversely affected . . . thus, an allegation of close proximity may give rise to an inference of damage or injury"); LaDelfa v. Village of Mount Morris, 213 A.D.2d 1024, 1025 (4th Dept. 1995) ("One of the petitioners owns property near the project site and alleges that his property would suffer non-economic harm from the environmental impacts of the project. That allegation is sufficient to show environmental harm that is different from that suffered by the public and to provide the requisite standing to pursue the claims").

While the PBA counters that "rather than sustaining any actual and imminent injury, Petitioner, its members, and the community at large will enjoy a net benefit from the demolition of the Busti Avenue Houses" (PBA's Memorandum of Law [39], p. 10), that argument more properly goes to the merits rather than to the question of standing. The injury alleged to have been sustained by the Campaign and its members need not be "earth-shatteringly severe in order to bestow standing". Levine v. Lawrence, 2005 WL 1412143, *14 (E.D.N.Y. 2005).

Therefore, I conclude that the Campaign has standing to seek a preliminary injunction.

**B.      The Standard for Issuance of a Preliminary Injunction**

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies".  Grand River Enterprise Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007).  It is "an extraordinary remedy never awarded as of right", Winter v. Natural Resources Defense Council, Inc. 555 U.S. 7, 24 (2008), and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion".  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original).

A party seeking a preliminary injunction must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction".  Red Earth LLC v. United States, 657 F.3d 138, 143 (2d Cir. 2011).

In Winter, the Supreme Court stated the test somewhat differently:  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20. Notwithstanding Winter's formulation of the test, the Second Circuit maintains that "[w]e have found no command from the Supreme Court that would foreclose the application of our established 'serious questions' standard as a means of assessing a movant's likelihood of success on the merits".  Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 38 (2d Cir. 2010).

In any event, "serious questions" standard is no less onerous than the "likelihood of success" standard: "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor . . . its overall burden is no lighter than the one it bears under the 'likelihood of success' standard". Citigroup, 598 F.3d at 35 (emphasis in original).

Whichever standard is applied, the requirements for issuance of a preliminary injunction are conjunctive - for example, in the absence of other factors supporting injunctive relief, it is not enough to show likelihood of success on the merits. *See* American District Telegraph v. Department of Energy, 555 F.Supp. 1244, 1251 (D.D.C. 1983) ("Even if the plaintiff could demonstrate a likelihood of success on the merits plaintiff has not demonstrated that the balance of interests favors him"); F.T.C. v. Laboratory Corp. of America, 2011 WL 3100372, *23 (C.D.Cal. 2011) ("Even if the FTC had demonstrated likelihood of success on the merits, such likelihood is minimal and heavily outweighed by the equities favoring denial of the injunction"); Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982) ("a federal judge . . . is not mechanically obligated to grant an injunction for every violation of law"); Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 244 F.Supp.2d 41, 55 (N.D.N.Y. 2003); aff'd in part and remanded in part on other grounds, 451 F.3d 77 (2d Cir. 2006), cert. denied, 549 U.S. 1252 (2007) ("Injunctive relief cannot automatically be granted upon a finding of statutory violation").

In deciding whether to grant or deny a preliminary injunction, "[t]he district court has broad discretion, since its task involves weighing the benefits and burdens that granting or denying the injunction will have on each of the parties and on the public". Penn Galvanizing Co. v. Lukens Steel Co., 468 F.2d 1021, 1023 (3rd Cir. 1972); Grand River, 481 F.3d at 66 ("The district court has wide discretion in determining whether to grant a preliminary injunction"). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24.

The court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24; Brown & Williamson Tobacco Corp. v. Engman, 527 F.2d 1115, 1121 (2d Cir. 1975), cert. denied, 426 U.S. 911 (1976) ("courts of equity may go much further both to give *or to withhold* relief in furtherance of the public interest than where only private interests are involved") (emphasis added).

I will consider the Campaign's motion in light of these principles.

## 1.    Irreparable Injury

"It is well established that an irreparable injury is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011). The Campaign argues that the "demolition project poses a significant risk of irreparable harm to the Campaign because but for the issuance of a temporary restraining order . . . the historic properties that are the subject of the suit would be bulldozed and destroyed, thereby rendering most triable issues to

become moot . . . . The Busti homes that are the subject of this suit are irreplaceable and unique. No adequate compensation exists." Campaign's Memorandum of Law [40], pp. 8 and 9 of 28.

The PBA responds that "the demolition of a vacant building does not give rise to irreparable harm, because a building, 'unlike the land, can be repaired or replaced if injured or destroyed,' and its destruction may be remedied by an award of money damages." PBA's Memorandum Law [41], p. 8, n. 3 (*citing* Pelfresne v. Village of Williams Bay, 865 F.2d 877, 883 (7th Cir. 1989)). However, the PBA admits that there is some historical value as to at least three of the homes at issue (PBA's Memorandum Law [41], pp. 7-8), and does not explain how that value could be accurately calculated or compensated.

Therefore, although I find it to be a close question, I conclude that the Campaign has sufficiently demonstrated that it and its members will suffer irreparable injury if the motion is not granted.

## 2.    Likelihood of Success/Serious Questions Going to the Merits

### A.    Is the PBA Subject to the Requirements of SEQRA?

Although the Campaign's Petition alleges several causes of action, it bases its motion for a preliminary injunction solely upon alleged SEQRA violations. *See* Campaign's Memorandum of Law [40], Point IV. Therefore, that is the only claim which I need address.

ECL §8-0109 (2) provides that "[a]ll agencies . . . shall prepare, or cause to be prepared by contract or otherwise an environmental impact statement ["EIS"] on any action they propose or approve which may have a significant effect on the environment." "Agency" is

defined as "any state or local agency". ECL §8-0105 (1-3). Accordingly, unless the PBA is considered to be a "state or local agency", it cannot be required to file an EIS.

While the New York Court of Appeals long ago stated that the PBA is "an agency of the State", People ex rel. Buffalo and Fort Erie Public Authority v. Davis, 277 N.Y. 292, 299 (1938), that statement was not made in the context of SEQRA, and is of questionable applicability in any event. For example, in Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 42 (1994), the Supreme Court held that "bistate entities created by compact . . . are not subject to the unilateral control of any one of the States that compose the federal system. Accordingly, there is good reason not to amalgamate Compact Clause entities with agencies of 'one of the United States'".

In Seattle Master Builders Association v. Pacific Northwest Electric Power and Conservation Planning Council 786 F.2d 1359, 1371 (9th Cir. 1986), cert. denied, 479 U.S. 1059 (1987), the court held that neither state to a bi-state compact could require the compact entity to file an environmental impact statement, since neither state had reserved in the compact the right to impose its laws upon that entity: "A state can impose state law on a compact organization only if the compact specifically reserves its right to do so . . . . Neither Washington nor Montana reserved such rights in their statutes agreeing to the establishment of the Council". The PBA notes that "[a]n examination of the statutes comprising the PBA's compact reveals that there has been no such consent or reservation of rights, in the legislation comprising the compact, to the unilateral imposition of New York state or local law upon the PBA". PBA's Memorandum of Law [39], p. 49.

Although the PBA is the product of an international rather than an interstate compact, it seems to me that the reasoning of Hess and Seattle Master Builders should apply with equal or even greater force to an international compact. Therefore, while I need not (and do not) definitively determine whether the PBA is subject to the requirements of SEQRA, I conclude that the Campaign has shown neither "a likelihood of success on the merits" nor a "serious question going to the merits to make them a fair ground for trial" (Red Earth LLC) on that issue.[6]

**B.      If It Is Subject to SEQRA's Requirements, Did the PBA Properly Apply Them in Issuing a Negative Declaration?**

Even if the Campaign could show that the PBA is subject to the requirements of SEQRA, in order to obtain relief it must also demonstrate that the PBA misapplied those requirements in issuing the Negative Declaration.

"In reviewing a SEQRA determination, a court is solely concerned with the procedural and substantive mandates of SEQRA, not with the ultimate environmental consequences of the *proposed* action." Mitskovski v. Buffalo and Fort Erie Public Bridge Authority ("Mitskovski II"), 2011 WL 285240, *2 (2d Cir. 2011) (Summary Order) (emphasis in original). "Judicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination was affected by an error of law or was arbitrary and capricious or an abuse of discretion . . . . In assessing an agency's compliance with the substantive mandates of the statute, the courts must review the record to determine whether the agency identified the relevant areas of

---

[6]      Nor, for reasons to be discussed, has it shown a balance of hardships "tipping decidedly" in its favor. Red Earth, LLC, Citigroup, supra.

-14-

environmental concern, took a hard look at them, and made a reasoned elaboration of the basis

for its determination." Chinese Staff v. Burden, 19 N.Y.3d 922, 924 (2012); Dunk v. City of

Watertown, 11 A.D.3d 1024, 1024-25 (4th Dept. 2004). "The court's role is not to weigh the

desirability of any proposed actions or choose among alternatives but only to insure that the

agency has satisfied the substantive and procedural requirements of SEQRA and of the

regulations implementing it." Dunk, 11 A.D.3d at 1025.

  "An agency's compliance with its substantive SEQRA obligations is governed by

a rule of reason and the extent to which particular environmental factors are to be considered

varies in accordance with the circumstances and nature of particular proposals . . . . Similarly,

agencies have considerable latitude evaluating environmental effects and choosing between

alternative measures.  While judicial review must be meaningful, the courts may not substitute

their judgment for that of the agency for it is not their role to weigh the desirability of any action

or to choose among alternatives.  Akpan v. Koch, 75 N.Y.2d 561, 570 (1990).


  **i.**  **Segmentation**

  The Campaign alleges that the PBA erred by failing to characterize the proposed

demolition as a "Type I" action under 6 N.Y.C.R.R. §617.4.  Petition [1-2], ¶¶60-62.  "[T]he fact

that an action or project has been listed as a Type I action carries with it the presumption that it is

likely to have a significant adverse impact on the environment and may require an EIS.".  Id., ¶60

(quoting  6 N.Y.C.R.R. §617.4(a)(1)).[7]  A Type I action includes an action "occurring wholly or

---

   [7]   However, "an EIS is not a per se requirement for a Type I action". Dunk, 11 A.D.3d at
1025.

partially within, or substantially contiguous to, any historic building, structure, facility, site or district or prehistoric site that is listed on the National Register of Historic Places". Id., ¶61 (*quoting* 6 N.Y.C.R.R. §617.4(b)(9)).

The Campaign argues that the Busti Avenue properties are "substantially contiguous to the historic Frederick Law Olmsted, Front Park, which is listed on the National Register of Historic Places and the State Register of Historic Places. Accordingly, the [PBA] failed to classify the 'project' as a Type I action and erred when it designated the project as an 'Unlisted' action." Id., ¶62.

The PBA responds that the Busti Avenue properties are not "substantially contiguous" to Front Park, since they share no common boundaries. *See* PBA's Memorandum of Law [39], pp. 16-18 and authorities cited therein; *see also* [4], p. PBA000153 ("The properties along Busti Avenue between Vermont and Rhode Island lack a visual and physical connection to Front Park"). The Campaign replies that "the demolition of the houses is not an independently justifiable act, but is an essential part of the [PBA's] expansion plans . . . . [I]f, as [the Campaign] asserts, the demolition of the homes should not have been segmented from the plaza expansion, then the environmental effects of the entire plaza project must be considered at the time that they determined to demolish the homes. In that instance, even accepting the PBA's definition of substantially contiguous, the plaza expansion would abut Front Park". Campaign's Reply Memorandum of Law [44], p. 2 of 4.

While it is true that "[c]onsidering only a part or segment of an action is contrary to the intent of SEQR" (6 N.Y.C.R.R. 617.3(g)), that does not mean that a segmented analysis is *per se* improper. "If a lead agency believes that circumstances warrant a segmented review, it

must clearly state in its determination of significance . . . the supporting reasons and must demonstrate that such review is clearly no less protective of the environment. Related actions should be identified and discussed to the fullest extent possible." Id. *See also* Scott v. City of Buffalo, 20 Misc.3d 1135(A), 2008 WL 3843532, \*\*19-20  (Sup.Ct. Erie Co. 2008), aff'd, 67 A.D.3d 1393 (4th Dept. 2009), lv. denied, 70 A.D.3d 1519 (4th Dept. 2010), lv. denied, 14 N.Y.3d 710 (2010) ("SEQR expressly provides that segmentation is permissible and a cumulative environmental review is not required if a lead agency believes that segmentation is warranted under the circumstances, provided that the agency: (i) clearly states its reasons therefore; and (ii) demonstrates that a segmented review will be no less protective of the environment)"; Concerned Citizens for the Environment v. Zagata, 243 A.D.2d 20, 22 (3d Dept. 1998).

While acknowledging that the demolition project "and the Potential Plaza Projects could be considered sufficiently related actions pursuant to SEQR to require a single environmental review process", the PBA "affirmatively determine[d] that segmentation of the environmental review for the Demolitions from the environmental review for any Potential Plaza Project is warranted under the circumstances and is no less protective of the environment". Negative Declaration [4], p. PBA000797.  Among the reasons which it cited for that determination were that "there are many uncertainties regarding various portions of the Potential Plans a Projects which may prevent such projects from ever occurring", including "whether the City of Buffalo will be willing to abandon public rights of way . . . whether the [PBA] will be able to acquire other properties necessary for any Potential Plaza Projects; and/or whether NYSDOT or some other State agency will be able and/or willing to use its powers of eminent

domain to assist with property acquisition in the event the [PBA] is unable to acquire any necessary property on its own." Id., p. PBA000798, ¶3.

The PBA noted that "[i]n contrast to Potential Plaza Projects, the Demolitions faces no uncertainty and involves no state or local agency action. Moreover, undertaking the Demolitions while the many uncertainties associated with the Potential Plans I Projects are resolved is reasonable. The Properties were acquired by the [PBA] with the intent of demolishing the structures and the [PBA] has no intent of allowing the structures to be used for residential purposes next to a poorly functioning Plaza". Id., ¶4. "While the demolitions may result in the availability of the Properties for other uses by the [PBA], the provision of additional buffering and green space has a long-standing and independent purpose of its own. Importantly, it is not practically determinative of whether the [PBA] will undertake Potential Plaza Projects in the future, if those actions are undertaken at all. Accordingly, segmentation of the environmental review for the Demolitions from any environmental review for the Potential Plaza Project is warranted under the circumstances." Id.

The PBA next discussed "several reasons [why] segmentation is no less protective of the environment" (id., ¶5), including the fact that "the Demolitions and any Potential Plaza Projects have independent utility each serving a different purpose. The Demolitions will remove the blighting influence caused by the largely vacant and boarded up structures, resolve potential safety issues associated with some of the more dilapidated structures, and provide a landscaped buffer between the adjacent neighborhood" (id., ¶6) ; that "undertaking the Demolitions does not commit the [PBA] to undertake any of the Potential Plaza Projects" (id., p. PBA000799, ¶7) ; and that "any future use of the Properties as part of any Potential Plaza Projects or otherwise will

be the subject of a full and complete an environmental review either by the [PBA] . . . or by another agency (to the extent Potential Plaza Projects require the involvement of a local or State agency, such agencies have an affirmative obligation to comply with SEQR).  Simply stated, no potentially significant adverse impacts from the Project worthy Potential Plaza Projects will escape SEQR review." Id., ¶8.

   "The standard of review . . . where a lead agency has made segmentation findings is reasonableness." Scott, 2008 WL 3843532, *19.  "Since it is not the court's role to evaluate de novo the data presented to the agency, the court must, as with substantive SEQR obligations generally, be guided by the rule of reason and refrain from substituting its judgment for that of the agency." Id., *20.  "[T]he Court's standard of review is the reasonableness of the segmentation determination as contrasted to de novo review of whether the two projects are sufficiently related to warrant a single environmental review." Id., *22.  Therefore, I need not determine whether a different decision as to segmentation would have been reasonable - I need only determine whether the PBA's stated reasons for segmentation were adequate, and I conclude that they were.

   Moreover, if the demolition of the Busti Avenue properties were to be considered part and parcel of the bridge plaza expansion, then it is doubtful that SEQRA could apply in any event, since the Campaign contends that SEQRA applies only to "the conduct of [the PBA's] activities *off* the site of the Bridge Plaza" (Campaign's Memorandum of Law [40], p. 16 of 28 (emphasis added)), and that the PBA "must comply with New York State law in the conduct of its affairs *outside* of the bridge facility". Id., p. 13 of 28 (emphasis added). *See* Mitskovski v. Buffalo and Fort Erie Public Bridge Authority, 689 F.Supp.2d 483, 491 (W.D.N.Y. 2010)

(Schroeder, M.J.) ("As the undisputed facts demonstrate that the [project] involved internal infrastructure improvements and relocation of existing infrastructure, neither New York nor the City of Buffalo can impose their environmental regulations upon the Public Bridge Authority").[8]

ii.     "Hard Look"

As stated previously, in determining whether the PBA complied with the requirements of SEQRA (assuming it was subject to those requirements), "the courts must review the record to determine whether the agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination."  Chinese Staff, 19 N.Y.3d at 924.

The Campaign alleges that the PBA "fail[ed] to address important environmental concerns such as Neighborhood character and offer[ed] conclusory statements . . . which do not meet the requisite 'hard look' standard of review. The demolition of buildings and properties that are listed as Local Landmarks in the City of Buffalo would constitute actions that significantly and adversely affect the quality of the environment, and as such, would require the drafting of an environmental impact statement pursuant to SEQRA".  Petition [1-2], ¶¶64, 65.

I disagree.  The PBA extensively, and in great detail, addressed all relevant areas of environmental concern underlying its conclusion that there would be no significant adverse environmental impacts from the demolition. See Negative Declaration [4], pp. PBA000791-796, ¶¶1-27; Hogan Affidavit [39-1], ¶¶58-66. While acknowledging the historic significance of some

---

[8]     Although the Second Circuit subsequently held that "Appellants' SEQRA challenge must be dismissed as moot" (Mitskovski II, 2011 WL 285240, *2), Judge Schroeder's reasoning is still persuasive authority.

of the properties in question, the PBA noted that their value was relatively low in their current condition, and that appropriate mitigation efforts were being undertaken. Negative Declaration [4], pp. PBA000793-794, ¶¶11-14.  It reached this conclusion only after consultation with other agencies such as the SHPO, which agreed that "the buildings have reached the end of their structural life and that rehabilitation or adaptive reuse . . . would be economically and programmatically unreasonable".  Id., p. PBA000794, ¶14.  *See* Dunk, 11 A.D.3d at 1025-26 ("The City Council determined that the demolition of the buildings did not have environmental significance because, although they were historic buildings, they were only a relatively small part of the Historic District in the City.  The City Council further elaborated that the buildings were unsafe and an 'eyesore' and that there was little opportunity for rehabilitation.  The record establishes that the City Council complied both procedurally and substantively with SEQRA. The City Council's determination to issue a negative declaration was neither arbitrary and capricious nor an abuse of discretion").

For these reasons, I conclude that the Campaign has failed to show either a likelihood of success on the merits, or a serious question going to the merits, on its claim that the PBA failed to comply with the requirements of SEQRA.


3.      **Balance of Hardships**

I likewise conclude that the balance of hardships does not weigh in favor of granting a preliminary injunction. While I have found that the Campaign and certain of its members have interests in the properties sufficient to confer standing, the vindication of those

interests is outweighed by the hardship which the PBA would suffer if a preliminary injunction were to be granted.

Neither the Campaign nor its members have a right of access to the properties, which were acquired by the PBA several years ago with a view toward their demolition. The properties are currently in a dilapidated condition, and could not be restored without considerable expense, which the Campaign has not offered to undertake. I further note that the Campaign did not voice any concerns when the demolition plans were discussed at the public forum on April 4, 2012.

**4.    The Public Interest**

While the properties in question may have some historic value, they are also unsafe and crime-ridden. *See* McCarthy Affidavit [39-4]; Rienas Affidavit [39-2], ¶¶4-6 and Ex. A. Therefore, the public interest would not be furthered by the granting of a preliminary injunction. *See* Pelfresne, 865 F.2d at 883 ("the buildings were so old, dilapidated or . . . out of repair as to be dangerous, unsafe, insanitary or otherwise unfit for human habitation, occupancy or use . . . . Under these circumstances, it was certainly well within [the court's] discretion to conclude that the public interest would be furthered by allowing the demolition to proceed").

**CONCLUSION**

Since the Campaign has failed to make a "clear showing" of its entitlement to a preliminary injunction (Mazurek, 520 U.S. at 972), in the exercise of this court's discretion, the Campaign's motion for a preliminary injunction [40] is denied, and the TRO is dissolved.

Dated: February 22, 2013

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge